UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

United States of America,

    Plaintiff,

           REPORT AND RECOMMENDATION

 vs.

Jeffrey Lee Dolson,

    Defendant.     Crim. No. 09-142 (JRT/RLE)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

## I.  Introduction

This matter came before the undersigned United States Magistrate Judge pursuant to a general assignment, made in accordance with the provisions of Title 28 U.S.C. §636(b)(1)(B), upon the following Motions of the Defendant Jeffrey Lee Dolson:

   A.  The Defendant's Motion to Suppress Evidence
      Obtained as a Result of Search and Seizure.

   B.  The Defendant's Motion to Suppress Statements,
      Admissions, and Answers.

A Hearing on the Motions was conducted on July 15, 2009, at which time, the

Defendant appeared personally, and by Douglas Olson, Assistant Federal Defender;

and the Government appeared by Clifford B. Wardlaw, Assistant United States Attorney.[1]

For reasons which follow, we recommend that the Defendant's Motions to Suppress be denied.

## II. Factual Background

The Defendant is charged with one (1) Count of being a Felon in Possession of a Firearm, in violation of Title 18 U.S.C. §§922(g)(1), and 924(a)(2). The events that gave rise to that charge are said to have occurred on or about February 23, 2009, in this State and District. As pertinent to the charge, and to the Motions now before us, the operative facts may be briefly summarized.[2]

---

[1]At the close of the Hearing, the parties requested leave to submit post-Hearing memoranda on the legal issues raised by the Defendant's Motions. Leave was granted, and therefore, the last submission on the issues was received on July 31, 2009, at which time, the Motion was taken under advisement. See, <u>Title 18 U.S.C. §3161(h) (1)(F) and (J)</u>; <u>Henderson v. United States</u>, 476 U.S. 321, 330-32 (1986); <u>United States v. Blankenship</u>, 67 F.3d 673, 676-77 (8th Cir. 1995).

[2]Rule 12(e), Federal Rules of Criminal Procedure, provides that "[w]here factual issues are involved in determining a motion, the court shall state its essential findings on the record." As augmented by our recitation of factual findings in our "Discussion," the essential factual findings, that are required by the Recommendations we make, are contained in this segment of our Opinion. Of course, these factual findings are preliminary in nature, are confined solely to the Motions before the Court, and are subject to such future modification as the subsequent development of the facts
(continued...)

At the Hearing, the Government adduced the testimony of Michael Engum ("Engum"), who is a Trooper with the Minnesota State Patrol. According to Engum, on February 23, 2009, he was on duty, and patrolling traffic on Highway 89, in Beltrami County. At approximately 7:39 o'clock p.m., Engum was parked on the shoulder of the highway, facing northbound, after completing a traffic stop.[3] At that time, Engum saw a full-sized Chevrolet Suburban (the "Suburban") pass by, while traveling southbound on Highway 89, without a front license plate. Engum testified that Minnesota law requires a front license plate on all vehicles, pursuant to Minnesota Statutes Section 169.79.[4] Accordingly, Engum made a U-turn in his patrol vehicle, and caught up to the Suburban, in order to conduct a traffic stop.

After the Suburban pulled over, Engum approached the front passenger door, where he made contact with the Defendant, who was the driver of the Suburban, as

---

[2](...continued)
and law may require. See, <u>United States v. Moore</u>, 936 F.2d 287, 288-89 (6th Cir. 1991), cert. denied, 505 U.S. 1228 (1992); <u>United States v. Prieto-Villa</u>, 910 F.2d 601, 610 (9th Cir. 1990).

[3]At the time of the Hearing, a videotape of the traffic stop, from the camera system inside of Engum's patrol vehicle, was admitted into evidence, without objection, as Defendant Exhibit 1.

[4]See, <u>Minnesota Statutes Section 169.79, Subdivisions 1 and 6</u>.

well as the Defendant's girlfriend, who was the front-seat passenger.[5]  In addition,

Engum testified that two (2) young children, ages two (2) and four (4), were playing

between the first and second rows of seats, and not restrained in car seats or seatbelts,

as required by Minnesota law.  See, <u>Minnesota Statutes Section 169.685, Subdivision</u>

<u>5</u>.  Engum testified that he smelled the odor of freshly burned marijuana coming from

the Suburban, as soon as the passenger window was opened.  Engum also testified that

the Defendant appeared to be nervous, as he was shifting and fidgeting in his seat.

While talking to Engum, the Defendant first turned 90 degrees, and kneeled in his

seat, and at another point, the Defendant turned nearly 180 degrees in his seat, facing

backward toward the children.  During this first interaction, Engum asked the

Defendant for his driver's license, proof of insurance, and vehicle registration.  At that

time, the Defendant and his girlfriend claimed ownership of the Suburban, although

they could not provide any proof of insurance.

At approximately 7:41 o'clock p.m., Engum walked back to his patrol vehicle,

in order to check the Defendant's driver's license.  Engum testified that he recognized

the Defendant's name from his driver's license, and he explained that, prior to the

---

[5]At the time of the Hearing, Engum positively identified the Defendant in the
Courtroom.

traffic stop, he knew of the Defendant's significant criminal history, as well as his status as a convicted, violent felon, from other law enforcement officers, who were involved in an unrelated criminal investigation. However, Engum testified that the traffic stop was his first personal contact with the Defendant.

While in his patrol vehicle, Engum made a telephone call to Ron Billings ("Billings"), and Gary Peterson ("Peterson"), who are law enforcement officers, and members of the Headwaters Task Force, which was involved in a simultaneous criminal investigation of the Defendant. According to Engum, he advised Billings and Peterson that he had made contact with the Defendant, during the course of a traffic stop, that the Defendant was nervous, and that he planned to issue a citation for the lack of child restraints. On cross-examination, Engum admitted that he did not tell Billings and Peterson that he had smelled marijuana in the Suburban, but he denied receiving any instructions from Billings and Peterson, as to the conduct of the traffic stop.

Through a records check, Engum learned that the Suburban was not registered to the Defendant or his girlfriend, so he returned to the Suburban, to inquire further into the ownership of the vehicle. According to Engum, the Defendant and his girlfriend explained that they had purchased the vehicle some time ago, but only

started using it recently.  At approximately 7:45 o'clock p.m., Engum returned to his

patrol vehicle for a second time, at which time, he called the Beltrami County

Sheriff's Office, in order to ask for the assistance of a canine unit.[6]  Engum testified

to his suspicion, that the Suburban contained drugs, based upon the odor of marijuana.

The canine unit was approximately ten (10) miles away, so Engum decided to remove

the Defendant from the Suburban, in order to reduce the risk of flight, and to prevent

the destruction of evidence.

According to Engum, at approximately 7:53 o'clock p.m., he returned to the

Suburban, and asked the Defendant to accompany him to the front of his patrol

vehicle, for an explanation of his citations.  Engum testified that he had already

written out a warning for the missing front license plate, as well as a citation for no

proof of insurance.  When the Defendant opened the driver's door, Engum saw a

serrated knife, with a six-inch blade, on the floor between the driver's seat and the gas

pedal.  Engum and the Defendant then walked to the front of the patrol vehicle, and

---

[6]In his direct examination, Engum testified that he called for a canine unit when he first returned to his patrol vehicle, in order to check the drivers license of the Defendant.  However, after viewing the videotape of the traffic stop, Engum recalled, during the course of his cross-examination, that he called for the canine unit a few minutes later, when he returned to his patrol vehicle for the second time.

Engum asked the Defendant to place his hands on the hood of the patrol vehicle for a pat search, as a precaution for officer safety.

According to Engum, the Defendant appeared upset, said that he would not be searched, and then turned to squarely face Engum. Engum was concerned that the Defendant might become combative and, owing to his knowledge of the Defendant's criminal history, and the knife he had viewed in the Suburban, Engum was also concerned that the Defendant might be armed. Accordingly, Engum began to draw his service weapon from his holster, but the Record is clear that he never pointed the weapon at the Defendant. Engum testified that the Defendant immediately became cooperative, and turned to place his hands on the patrol vehicle, at which point, Engum performed a pat search. During the pat search, Engum felt a hard cylinder in the Defendant's front pocket, but he did not remove it. Engum then informed the Defendant that he had smelled marijuana in the Suburban, which the Defendant vehemently denied.

According to Engum, the Defendant stated that Engum had no right to search the Suburban, and our review of the videotape discloses that the Defendant then asked, "Can I call an attorney?" During his cross-examination, Engum could not recall if he had a chance to respond to the Defendant's question, before the Defendant continued

talking.[7]  Engum then asked the Defendant when marijuana had last been smoked in the Suburban, and the Defendant replied that his "homies" had smoked marijuana in the Suburban the night before.  Engum asked the Defendant about the hard cylinder in his front pocket, and the Defendant said that it was used to roll joints.  According to Engum, the Defendant then produced a marijuana grinder, and rolling papers, from his pocket.

At that point, the Defendant sat down on the back seat of Engum's patrol vehicle.  Engum testified that the Defendant was not handcuffed at that time, although he was locked inside the patrol vehicle.  In his testimony, Engum reiterated that he removed the Defendant from the Suburban, in order to reduce the risk of flight, and to prevent the destruction of evidence.  However, Engum testified that, because of the windchill and winter temperatures, he placed the Defendant in the patrol vehicle, in order to protect him from the elements.  After the Defendant was locked inside the patrol vehicle, the Defendant offered to give Engum all of his marijuana, if Engum promised not to search the Suburban.  Although Engum did not agree to the

_____

[7]Despite our review of the videotape, we are unable to conclusively determine whether Engum shook his head, in order to indicate "no" in response to the Defendant's question, but it does appear that the Defendant awaited for no response from Engum, but continued to talk.

Defendant's proposal, the Defendant produced approximately six (6) grams of marijuana from his person. Nonetheless, Engum informed the Defendant that the odor of marijuana provided a basis to perform a dog sniff of the Suburban.

At approximately 8:02 o'clock p.m., Deputy Walton ("Walton"), and Deputy Roberts ("Roberts") arrived, from the Beltrami County Sheriff's Office. According to Engum, the Defendant's girlfriend and the children were removed from the Suburban during the dog sniff, for safety reasons, and placed in the backseat of Roberts' patrol vehicle, for protection from the winter weather. Engum then informed Walton that he had smelled marijuana in the Suburban, that the Defendant's friends had smoked marijuana in the Suburban during the previous evening, and that the Defendant had produced marijuana and paraphernalia from his person during the course of the traffic stop. At approximately 8:09 o'clock p.m., Walton's canine conducted a dog sniff on the exterior of the Suburban, and at approximately 8:11 o'clock p.m., the canine entered the vehicle, to sniff the interior. At approximately 8:16 o'clock p.m., Walton informed Engum that the canine had alerted to the center console of the Suburban, and Engum decided to search the Suburban by hand, for drugs. During his direct examination, Engum testified to his recollection, that the canine had also alerted on the exterior of the vehicle. However, upon cross-

examination, Engum read a portion of Walton's report into the Record, in which Walton stated that his canine "did not indicate on the exterior of the vehicle." See, Defendant Exhibit 2.[8]

Engum testified that he, Walton, and Roberts, then hand-searched the Suburban, and they found evidence of marijuana, including stems and seeds. In addition, Engum testified that he found a Glock handgun, which was wedged between the driver's seat and the center console. At that time, Engum informed Walton, and Roberts, that the Defendant was a convicted felon. In his testimony, Engum averred that Roberts took photographs of the handgun, before Engum took it into evidence. At approximately 8:17 o'clock p.m., Engum formally arrested and handcuffed the Defendant, who remained in the backseat of Engum's patrol vehicle.

In his current Motions, the Defendant contends that the search of his vehicle was illegal, because he "was illegally and improperly detained longer than was justified under the circumstances." Defendant's Memorandum in Support, Docket No.

---

[8]At the time of the Hearing, the Government objected to the use of Walton's report, in order to impeach Engum's testimony, on the basis of relevance. However, the Government did not object to the foundation of Walton's report, which was admitted into evidence as Defendant Exhibit 2, over the Government's objection, but subject to our subsequent determination of its relevance. We find the document to be relevant to our overall assessment of Engum's credibility.

33, at p. 6. As a result, the Defendant asserts that the marijuana, the gun, and his statements, should be suppressed as the "products of the illegal detention." Id. at p. 6 n. 1. While the Defendant offered no briefing or argument on his Motion to Suppress his Statements, we have closely examined the Record for evidence which would support that Motion. The Government opposes the Motions, and we address the parties' arguments in turn.

## III. Discussion

### A. The Validity of the Traffic Stop.

1. Standard of Review. The Fourth Amendment provides that "the right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." United States Constitution, Amendment IV. A roadside traffic stop "is well established" as a "'seizure' within the meaning of the Fourth Amendment." United States v. Jones, 269 F.3d 919, 924 (8th Cir. 2001), quoting Delaware v. Prouse, 440 U.S. 648, 653 (1979); see also United States v. Martinez-Fuerte, 428 U.S. 543, 556-558 (1976); United States v. Brignoni-Ponce, 422 U.S. 873, 878 (1975). An essential purpose behind the Fourth Amendment's proscriptions is to impose standards of reasonableness upon the exercise of law enforcement's discretionary powers, so as to safeguard an individual's

- 11 -

privacy from arbitrary invasion by the Government.  See, <u>Delaware v. Prouse</u>, supra at 653-54; <u>Marshall v. Barlow's Inc.</u>, 436 U.S. 307, 312 (1978); <u>Camara v. Municipal Court</u>, 387 U.S. 523, 528 (1967).  Thus, whether or not a certain action is permissible, under the Fourth Amendment, "is judged by balancing [that action's] intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests."  <u>Id.</u> at 654.

In considering the extent to which a traffic stop intrudes upon an individual's Fourth Amendment interests, the Supreme Court has held that traffic stops are investigative detentions, not custodial detentions, and therefore, the principles of <u>Terry v. Ohio</u>, 392 U.S. 1 (1968), govern the analysis of the reasonableness of the stop.  See, <u>United States v. Jones</u>, supra at 925, citing <u>Berkemer v. McCarty</u>, 468 U.S. 420, 439 (1984); see also, <u>Delaware v. Prouse</u>, supra at 663.  As a consequence, the Supreme Court has instructed that, prior to making a traffic stop, a law enforcement officer must have "probable cause to believe that a driver is violating any one of the multitude of applicable traffic and equipment regulations -- or other articulable basis amounting to reasonable suspicion that the driver is unlicensed or his vehicle unregistered."  <u>Delaware v. Prouse</u>, supra at 661.

There is no requirement that there be a traffic violation, so long as the police officer has a reasonable suspicion that the vehicle, or its occupants, are involved in criminal activity. See United States v. Mora-Higuera, 269 F.3d 905, 909 (8th Cir. 2001), cert. denied, sub nom. Botello v. United States, 537 U.S. 828 (2002), citing Alabama v. White, 496 U.S. 325 (1990)). "Reasonable suspicion requires '"a particularized and objective basis" for suspecting the person stopped of criminal activity,'" which is not as demanding a standard as a showing of probable cause. Thomas v. Dickel, 213 F.3d 1023, 1025 (8th Cir. 2000), cert. denied, 531 U.S. 1013 (2000), quoting Ornelas v. United States, 517 U.S. 690 (1996), quoting, in turn, United States v. Cortez, 449 U.S. 411, 417 (1981); and citing United States v. Sokolow, 490 U.S. 1 (1989). If an investigatory stop is not justified by reasonable suspicion, any evidence derived from the stop is inadmissible at Trial. See, United States v. Wheat, 278 F.3d 722, 726 (8th Cir. 2001), cert. denied, 537 U.S. 850 (2002), citing Wong Sun v. United States, 371 U.S. 471, 484 (1963).

       2.    Legal Analysis. On the Record presented, it is clear that the traffic stop of the Defendant's vehicle was supported by probable cause, given the missing front license plate. See, United States v. Binion, 570 F.3d 1034, 1038 (8th Cir. 2009)("Any traffic violation creates probable cause to stop a vehicle * * * ."); see

also, United States v. Sanchez, 572 F.3d 475, ---, 2009 WL 2004013 at *3 (8th Cir., July 13, 2009)(finding no Fourth Amendment violation, where a vehicle was stopped for a missing license plate under Nebraska law, which requires front and rear license plates); United States v. Smart, 393 F.3d 767, 770-771 (8th Cir. 2005), cert. denied, 545 U.S. 1121 (2005)(same, applying Iowa law).  Indeed, the Defendant has not challenged the basis for the initial stop of his vehicle.

Once stopped, an officer may then conduct a "reasonable investigation," which includes "asking for the driver's license and registration, requesting that the driver sit in the patrol car, and asking the driver about his destination and purpose," and he "may engage in similar routine questioning of the vehicle's passengers to verify information provided by the driver."  United States v. Johnson, 58 F.3d 356, 357 (8th Cir. 1995)[internal citations omitted], cert. denied, 516 U.S. 936 (1995); see also, United States v. Foley, 206 F.3d 802, 805 (8th Cir. 2000); United States v. Sanchez, 417 F.3d 971, 974-75 (8th Cir. 2005).  The questioning is limited, however, to the circumstances that justified the stop.  See, United States v. Johnson, 64 F.3d 1120, 1124 (8th Cir. 1995), cert. denied, 516 U.S. 1139 (1996), citing United States v. Cummins, 920 F.2d 498, 501 (8th Cir. 1990), cert. denied, 502 U.S. 962 (1991).  As noted, attendant with the traffic stop, an officer may request that the driver and/or the

passenger step out of the vehicle. See, <u>United States v. Beatty</u>, 170 F.3d 811, 812 (8th Cir. 1999).

Here, Engum's initial questioning of the Defendant was clearly appropriate, as he simply asked for identification, registration, and proof of insurance. See, e.g., <u>United States v. White</u>, 81 F.3d 775, 778 (8th Cir. 1996), cert. denied, 519 U.S. 1011 (1996)("A law enforcement officer may also run a computer check to establish whether the vehicle has been stolen and to ascertain whether there are outstanding arrest warrants for the occupants of the car."); <u>United States v. Morris</u>, 910 F. Supp. 1428, 1441 (N.D. Iowa 1995)("A detention following a vehicle stop does not exceed its reasonable scope while the law enforcement officer who made the stop makes an initial request for identification from the driver and any passengers, asks for an explanation of the presence of the occupants of the vehicle in the area, their destination and purpose, and runs a warrant check on the drivers licenses of all occupants of the vehicle, and a check on the registration of the vehicle to see if it is stolen or otherwise not in order."). However, the Defendant argues that he was "illegally and improperly detained longer than was justified under the circumstances," once Engum had concluded that "he had nothing but a ticket to write in the case." <u>Defendant's Memorandum in Support</u>, supra at p. 6 and n. 1. We disagree.

During the course of a traffic stop, the officer may expand the scope of his questioning "'if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense."  United States v. Johnson, supra, 58 F.3d at 357, quoting United States v. Barahona, 990 F.2d 412, 416 (8th Cir. 1993), overruled on other grounds, Muehler v. Mena, 544 U.S. 93 (2005); see also, United States v. Foley, supra at 806 ("An officer may properly expand the scope of his investigation as reasonable suspicion dictates."); United States v. Ramos, 42 F.3d 1160, 1163 (8th Cir. 1994), cert. denied, 514 U.S. 1134 (1995), overruled on other grounds, Muehler v. Mena, supra ("If reasonably related questions raise inconsistent answers, or if the licenses and registration do not check out, a trooper's suspicions may be raised so as to enable him to expand the scope of the stop and ask additional, more intrusive, questions.").

Here, Engum testified that he smelled the odor of freshly burned marijuana as soon as the Suburban's passenger window was opened.  In addition, Engum testified that the Defendant appeared nervous, and fidgeted in his seat, during the course of their initial conversation.  Thus, Engum had at least a reasonable suspicion that the Defendant was involved in criminal activity, which justified further investigation. See, United States v. Binion, supra at 1039 (finding a reasonable suspicion that the

Defendant "was involved in criminal activity because of the strong odor of marijuana emanating from the car and his person, as well as his lethargy, nervousness, and shakiness," which justified investigation beyond the scope of the original traffic stop).

At approximately 7:46 o'clock p.m., because of his suspicion that the vehicle contained marijuana, Engum called for a canine unit. See, Defendant Exhibit 1. Here, we understand the Defendant to argue that the traffic stop was unreasonably prolonged, because the canine unit did not arrive for approximately fifteen (15) minutes. See, Defendant's Memorandum in Support, supra at p. 7. Understandably, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." United States v. Sanchez, supra at 975, quoting United States v. Bloomfield, 40 F.3d 910, 916 (8th Cir. 1994), cert. denied, 514 U.S. 1113 (1995); Florida v. Royer, 460 U.S. 491, 500 (1983). "Similarly, the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." Id.; see also, United States v. Willis, 967 F.2d 1220, 1224 (8th Cir. 1992). Accordingly, "[a] 'de facto arrest occurs when the officer's conduct is more intrusive than necessary for an investigative stop.'" United States v. Hill, 91 F.3d 1064, 1070 (8th Cir. 1996), quoting United States v. Bloomfield, supra at 917; see, United States v. Navarete-Barron, 192 F.3d

786, 791 (8th Cir. 1999)("A Terry stop may turn into an arrest if the stop lasts for an unreasonably long time or if officers use unreasonable force.").

In determining whether a police encounter with a citizen is a <u>de facto</u> arrest, our Court of Appeals has instructed as follows:

> Time is an important factor in distinguishing between an investigative stop and a <u>de facto</u> arrest: There is "no rigid timeline on Terry stops," United States v. Sharpe, 470 U.S. 675, 685, 105 S.Ct. 1568, 1575, 84 L.Ed.2d 605 (1985), but a stop may be too long if it involves "delay unnecessary to the legitimate investigation of the law enforcement officers, id. at 687, 105 S.Ct. at 1576. Another factor is "the degree of fear and humiliation that the police conduct engenders." United States v. Lego, 855 F.2d 542, 544-45 (8th Cir. 1988)(citation omitted). The courts have also held that transporting a suspect to another location or isolating him from others can create an arrest. See, [United States v.] Rose, 731 F.2d [1337, 1342 (8th Cir. 1984), cert. denied 469 U.S. 931 (1984)]. Additional factors that may weigh in favor of an arrest are subjecting a suspect to unnecessary delays, handcuffing him, or confining him to a police car.

United States v. Bloomfield, supra at 917; see, United States v. Ruiz, 412 F.3d 871, 879 (8th Cir. 2005), cert. denied, 546 U.S. 994 (2005); United States v. Dixon, 51 F.3d 1376, 1380 (8th Cir. 1995); United States v. Hawkins, 59 F.3d 723, 727 (8th Cir. 1995), cert. granted, and judgment vacated on other grounds, 516 U.S. 1168 (1996).

Here, the traffic stop was prolonged by a period of fifteen (15) minutes, in order to await the arrival of the canine unit, as well as an additional fifteen (15) minutes, while the canine sniffed the vehicle.

"Such a dog sniff may be the product of an unconstitutional seizure * * * if the traffic stop is unreasonably prolonged before the dog is employed." United States v. Suitt, 569 F.3d 867, 870 (8th Cir. 2009), quoting United States v. Alexander, 448 F.3d 1014, 1016 (8th Cir. 2006), cert. denied, 549 U.S. 1118 (2007), citing, in turn, Illinois v. Caballes, 543 U.S. 405, 407 (2005). "Whether a particular detention is reasonable in length is a fact-intensive question, and there is no per se time limit on all traffic stops." Id. at 871, quoting United States v. Olivera-Mendez, 484 F.3d 505, 510 (8th Cir. 2007). "To establish an unreasonably prolonged detention, the defendant must show that the officer detained him beyond the amount of time otherwise justified by the purpose of the stop and did so without reasonable suspicion." United States v. Donnelly, 475 F.3d 946, 951-952 (8th Cir. 2007), cert. denied, 551 U.S. 1123 (2007), citing United States v. Martin, 411 F.3d 998, 1002 (8th Cir. 2005).

The Defendant correctly notes that, under the law of this Circuit, "[o]nce an officer has decided to permit a routine traffic offender to depart with a ticket, a warning, or an all clear, the Fourth Amendment applies to limit any subsequent detention or search." United States v. Peralez, 526 F.3d 1115, 1120 (8th Cir. 2008), quoting United States v. Alexander, supra at 1016. The Defendant makes much of Engum's telephone conversation with the Task Force members, in which Engum

advised that he intended to cite the Defendant for a lack of child restraints, and he argues that, "[s]ince [Engum] had nothing and was going to just write him a ticket, any further detention was unreasonable." Defendant's Memorandum in Support, supra at p. 7. However, Engum testified repeatedly, and credibly, that he smelled the odor of freshly burned marijuana as soon as the Suburban's passenger window was opened. As a result, Engum had a reasonable suspicion of criminal activity, which supported further investigation, beyond the scope of the original traffic stop. See, United States v. Suitt, supra at 872; United States v. Peralez, supra at 1120 ("[I]f the officer develops reasonable suspicion that other criminal activity is afoot, the officer may expand the scope of the encounter to address that suspicion."); United States v. Lyons, 486 F.3d 367, 372 (8th Cir. 2007)("The termination of the traffic stop did not effectively erase the objectively reasonable suspicion developed by Trooper Brehm during the traffic stop.").

In addition, we conclude that there was no de facto arrest here, and that the length of time was reasonable under the circumstances. The traffic stop was initially prolonged by the discrepancy, between the Defendant's assertion of ownership of the Suburban, and Engum's discovery that the vehicle was registered to another individual. See, United States v. Peralez, supra at 1119 ("If complications arise during

these routine tasks" -- i.e., "asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose" -- "the vehicle may reasonably be detained 'for a longer duration than when a stop is strictly routine.'"), quoting United States v. Olivera-Mendez, supra at 510.

Subsequently, the only perceivable delay was occasioned by the need to await the canine unit's arrival at the scene and, on the Record presented, it appears that Engum and the other officers acted diligently. "[W]hen police need the assistance of a drug dog in roadside Terry stops, it will in general take time to obtain one * * * [because] the state highway patrol cannot be expected to have drug dogs immediately available to all officers in the field at all times." United States v. Lyons, supra at 372, quoting United States v. Bloomfield, supra at 917. Here, Engum testified that he called for the canine unit approximately eight (8) minutes into the traffic stop, at which time, the canine unit was ten (10) miles away, and the canine unit arrived approximately fifteen (15) minutes later. We find that amount of time reasonable under the circumstances presented. See, United States v. Lyons, supra at 372 ("The officers acted diligently in pursuit of their investigation, and the thirty-one minute wait was not excessive under the circumstances."); United States v. Bloomfield, supra at 917 (Where police acted diligently, "[t]he one-hour period between the time

Roberts pulled Bloomfield over and the time Roberts arrested Bloomfield was not an unreasonable period to wait for a drug dog to verify Roberts' suspicion."); United States v. Donnelly, supra at 953 ("[U]nder the proper circumstances, we have considered delays for dog-sniffs far in excess of 90 minutes reasonable.").

Lastly, after calling for the canine unit, Engum removed the Defendant from his vehicle, in order to prevent flight, or the destruction of evidence. When the Defendant stepped out of the vehicle, Engum observed a knife in plain view, on the floor in front of the driver's seat. Engum testified to his concern, that the Defendant might be armed, particularly given his knowledge of the Defendant's criminal history. As a result, Engum conducted a pat search of the Defendant, before placing him in the back seat of the patrol vehicle, in order to await the canine unit.

"During a Terry stop, officers may check for weapons and take any additional steps 'reasonably necessary to protect their personal safety and maintain the status quo during the course of the stop.'" United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992), quoting United States v. Hensley, 469 U.S. 221, 235 (1986). This includes "conduct[ing] a limited pat-down search of the individual's outer clothing for the purpose of uncovering concealed weapons if the officer has a reasonable, articulable suspicion that the person is armed and dangerous." United States v. Gilliam, 520 F.3d

844, 847-848 (8th Cir. 2008); <u>United States v. West</u>, 615 F. Supp.2d 957, 961 (S.D. Iowa 2009)("[T]he defendant's history of illegal activity * * * [is a factor] properly considered in determining whether reasonable suspicion exists.").

Here, given Engum's reasonable suspicion that the Defendant might be armed, we conclude that a pat search was warranted and, in view of the inclement weather, it was objectively reasonable to place the Defendant in the patrol vehicle, pending the arrival of the canine unit, in order to maintain the status quo. See, <u>United States v. Binion</u>, supra at 1039-1040; <u>United States v. Walker</u>, 555 F.3d 716, 721 (8th Cir. 2009)(finding no basis for suppression, where "[t]he removal of Walker and the passenger from the vehicle and the use of handcuffs by the police were part of a protective search," during the course of a <u>Terry</u> stop); <u>United States v. Brooks</u>, 290 Fed.Appx. 955, 960 (8th Cir. 2008)(Where officers had observed a knife in plain view inside the vehicle, and had a reasonable suspicion that the vehicle's occupants were involved in a drug transaction, "the officers were justified in asking all of the Camry's occupants to exit the vehicle, in performing pat-down searches of all the occupants for weapons, and in maintaining the status quo by asking Brooks to remain seated on the curb while they completed their brief investigation."); <u>United States v. Maltais</u>, 403 F.3d 550, 556 (8th Cir. 2005), cert. denied, 546 U.S. 1177 (2006)(concluding that it

was objectively reasonable to detain the defendant in a patrol vehicle, pending the arrival of a canine unit, where the officer had a reasonable suspicion of the defendant's involvement in a drug smuggling ring, and the "two men were alone in a remote area in the middle of the night").

In addition, we find no basis to suppress the marijuana grinder, and rolling papers, which were discovered in the Defendant's front pocket, during the course of the pat search.  See, United States v. Binion, supra at 1040 ("If an officer detects apparent contraband during a valid protective frisk, the officer may seize the item."); United States v. Stachowiak, 521 F.3d 852, 855 (8th Cir. 2008)("If, while conducting a valid search under Terry * * * , officers discover drugs instead of a weapon, the fourth amendment does not require the drug-related evidence to be suppressed.").

Finding no violation of the Defendant's constitutional rights, as a result of the initial traffic stop, the delay for the canine unit, or the pat search, we turn to consider whether the Defendant's subsequent statements to Engum must be suppressed.

B.     The Defendant's Statements to Engum.

1.     Standard of Review.  Government agents are not required to administer Miranda warnings to everyone they question.  See, Oregon v. Mathiason, 429 U.S. 492, 495 (1977).  Rather, Miranda warnings are required for official interrogations where a person has been "'taken into custody or otherwise deprived of his freedom of action in any significant way.'"  Stansbury v. California, 511 U.S. 318, 322 (1994), quoting Miranda v. Arizona, 384 U.S. 436, 444 (1966); United States v. Helmel, 769 F.2d 1306, 1320 (8th Cir. 1985); Berkemer v. McCarty, supra at 428-29.

"Miranda warnings are not necessary during ordinary Terry stops because they generally do not amount to custodial interrogation."  United States v. Johnson, supra, 64 F.3d at 1126, citing Berkemer v. McCarty, supra at 439-440; see also, United States v. McGauley, 786 F.2d 888, 890 (8th Cir. 1986)("No Miranda warning is necessary for persons detained for a Terry stop."); United States v. Pelayo-Ruelas, 345 F.3d 589, 592 (8th Cir. 2003).  As the Court explained, in United States v. Pelayo-Ruelas, supra at 592, quoting Berkemer v. McCarty, supra at 439-40:

> The [Terry] stop and inquiry must be reasonably related in scope to the justification for their initiation.  Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's

suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively non-threatening character of detentions of this sort explains the absence of any suggestion in our opinions that Terry stops are subject to the dictates of Miranda. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not "in custody" for the purpose of Miranda.

We accept, as did the Court in Pelayo-Ruelas, that "[o]ne is not free to leave a Terry stop until the completion of a reasonably brief investigation, which may include limited questioning[,] * * * [b]ut most Terry stops do not trigger the detainee's Miranda rights." Id.

2. Legal Analysis. Here, the Defendant first challenges the statements he made to Engum, as the "products of [his] illegal detention." Defendant's Memorandum in Support, supra at p. 6 n. 1. However, we have already concluded that Engum had at least an articulable reasonable suspicion of criminal activity, which justified his investigation beyond the scope of the original traffic stop. Although the Defendant does not expressly argue the point, we presume, based upon his counsel's questioning of Engum that, in the alternative, his statements must be

suppressed because Engum failed to provide him a <u>Miranda</u> warning.   See,

<u>Defendant's Motion to Suppress Statements</u>, <u>Docket No. 22</u>.

As noted, while waiting for the canine unit to arrive, Engum informed the

Defendant that he had smelled marijuana coming from the open window of the

Suburban, which the Defendant denied.  The Defendant then refused to consent to a

search of the vehicle, and he asked Engum "Can I call a lawyer."  Our review of the

videotape discloses that the Defendant continued talking, before Engum made any

verbal response to the Defendant's question.  See, <u>Defendant Exhibit 1</u>.  Engum then

asked the Defendant when marijuana had last been smoked in his vehicle, and the

Defendant replied that a couple of his "homies" had smoked in the vehicle the night

before.   <u>Id.</u> Subsequently, the Defendant was placed in the back seat of the patrol

vehicle, at which time, he produced the marijuana grinder and rolling papers from his

front pocket.

Engum then returned to the Defendant's vehicle, where he spoke briefly with

the Defendant's girlfriend. See, <u>Defendant Exhibit 1</u>.  Approximately one (1) minute

later, Engum returned to the patrol vehicle, and the Defendant made an unsolicited

offer to give Engum his marijuana, if Engum would refrain from searching the

vehicle. <u>Id.</u>  According to Engum, the Defendant then produced approximately six (6)

grams of marijuana, and Engum advised that he appreciated the Defendant's honesty, but that he intended to move forward with the dog sniff. Id.

In his testimony, Engum averred that he did not intend to arrest the Defendant, until the handgun was discovered in the vehicle. Instead, Engum attested that he would have issued the Defendant an additional citation, for possession of marijuana, although he acknowledged that the Defendant was not free to leave, until the dog sniff was complete. In addition, Engum testified that, when he placed the Defendant in the patrol vehicle, in order to await the canine unit, he informed the Defendant that he was not under arrest, and his testimony is corroborated by our review of the videotape. See, Government Exhibit 1. On the Record presented, there is no evidence that Engum administered a Miranda warning.

Nonetheless, we conclude that no Miranda warning was required, because the Defendant was not in custody, prior to the discovery of the handgun. "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by Miranda." United States v. Martinez, 462 F.3d 903, 909 (8th Cir. 2006), cert. denied, 549 U.S. 1272 (2007), quoting Berkemer v. McCarty, supra at 440. "Factors useful in considering whether custody is involved

are whether the suspect was advised that he was free to go, whether he was restrained, whether he initiated contact with authorities, whether strong arm tactics or deceptive stratagems were used, whether the atmosphere was police dominated, and whether the suspect was placed under arrest at the termination of questioning." United States v. Johnson, supra, 64 F.3d at 1126, citing United States v. Griffin, 922 F.2d 1343, 1348 (8th Cir. 1990). Notably, in Martinez, the motorist "was detained by two officers, patted down for weapons (with none being found), and closely questioned about his possession of weapons," before finally being "handcuffed and told he was being further detained." United States v. Martinez, supra at 909. There, the Court concluded that the motorist was in custody, and entitled to a Miranda warning, "at the time he was handcuffed." Id.

Here, by contrast, the Defendant was not handcuffed or arrested, prior to the discovery of the handgun -- in fact, Engum explicitly advised the Defendant that he was not under arrest, and the Defendant cooperated when asked to sit in the back seat of the patrol vehicle. Moreover, Engum did not make use of any strong-arm tactics, when he asked the Defendant a single question, in order to confirm or dispel his suspicion, that the vehicle contained marijuana. See, United States v. Johnson, supra, 64 F.3d at 1126 (concluding that the defendants were not in custody, even though they

"did not initiate the police contact," where both defendants were advised that they were not under arrest, and "both responded to questions, and * * * affirmatively agreed to enter the squad car and talk * * * ."). While it is true that, when Engum perceived that the Defendant was "squaring off" with him, Engum began to withdraw his side arm, he did not point any weapon at the Defendant and, after the Defendant responded with cooperation, no further threatened resort to a service weapon followed.

Although the Defendant was restrained, in that he was locked inside the patrol vehicle, an officer may remove a motorist from a vehicle, during the course of a traffic stop, or a Terry stop. See, United States v. Young, 68 Fed.Appx. 744, 746 (8th Cir. 2003); see also, United States v. Pelayo-Ruelas, supra at 592 ("One is not free to leave a Terry stop until the completion of a reasonably brief investigation, which may include limited questioning."); United States v. Johnson, supra, 64 F.3d at 1126 (concluding that the defendants were not in custody, during the course of a Terry stop because, "[a]lthough their freedom of movement was somewhat restricted because they were questioned in squad cars, they were not handcuffed or otherwise restrained."); compare United States v. Rankins, 2008 WL 2020317 at *5-6 (E.D. Mo., May 7, 2008)(finding that the defendant was not in custody, even where the officer drew his gun, ordered the defendant out of his vehicle, and then placed the defendant

in handcuffs, prior to investigative questioning).  Moreover, Engum testified that the inclement weather necessitated the Defendant's placement in the patrol vehicle.  Cf., United States v. Maxwell, 2009 WL 1920085 at *12 (E.D. Mo., June 18, 2009)("[A]lthough Defendant was placed in handcuffs while his pockets were searched, even Defendant admits that he was specifically advised * * * that he was not under arrest and that he was being placed in cuffs simply for their own safety.").

As a result, we find no basis to suppress either of the Defendant's statements, owing to the absence of a Miranda warning, because he was not subjected to custodial interrogation.[9]  See, United States v. Martinez, supra at 909 ("[M]ost Terry stops do not trigger the detainee's Miranda rights."), quoting United States v. Pelayo-Ruelas,

---

[9]Our conclusion is not impacted by the Defendant's question to Engum, following the pat search -- "Can I call an attorney?"  "The Miranda right to counsel only attaches when a suspect invokes the right during custodial interrogation by making [a] clear and unequivocal request for counsel."  United States v. Bacote, 2006 WL 1579998 at *8 (D. Minn., June 2, 2006), aff'd, 266 Fed.Appx. 497 (8th Cir. 2008), citing, among others, Dormire v. Wilkinson, 249 F.3d 801, 805 (8th Cir. 2001), cert. denied, 534 U.S. 962 (2001)("Considering the question in context, it is not clear that Wilkinson was actually requesting the presence of an attorney when he asked 'Could I call my lawyer?'").  Here, the Defendant did not make a clear and unequivocal request for counsel, nor was he subjected to custodial interrogation.  As a result, we find no violation of his Miranda rights particularly when the Defendant awaited no response from Engum, but continued to make statements.

supra at 592. Until the discovery of the handgun, and the Defendant's formal arrest, his detention remained within the scope of a <u>Terry</u> stop.

In addition, we find that the Defendant's second statement, in which he offered to produce his marijuana if Engum agreed not to search the vehicle, was voluntary and spontaneous, and not the product of interrogation or questioning by Engum. Our Court of Appeals has "'repeatedly held that "[a] voluntary statement made by a suspect, not in response to interrogation, is not barred [by the Fifth Amendment] and is admissible with or without the giving of <u>Miranda</u> warnings."'" <u>United States v. Turner</u>, 157 F.3d 552, 556 (8th Cir. 1998), quoting <u>United States v. Hatten</u>, 68 F.3d 257, 261 (8th Cir. 1995), cert. denied, 516 U.S. 1150 (1996), quoting, in turn, <u>Rhode Island v. Innis</u>, 446 U.S. 291, 299 (1980); <u>United States v. Cunningham</u>, 133 F.3d 1070, 1074 (8th Cir. 1998), cert. denied, 523 U.S. 1131 (1998)(where officers merely listen to suspect, nothing prohibits use of suspect's statements against him); <u>United States v. Hayes</u>, 120 F.3d 739, 744 (8th Cir. 1997)("'<u>Miranda</u> does not protect an accused from a spontaneous admission made under circumstances not induced by the investigating officers or during a conversation not initiated by the officers.'"), quoting <u>United States v. Hawkins</u>, 102 F.3d 973, 975 (8th Cir. 1996), cert. denied, 520 U.S. 1179 (1997), citing, in turn, <u>Butzin v. Wood</u>, 886 F.2d 1016, 1018 (8th Cir. 1989), cert.

denied, 496 U.S. 909 (1990); <u>United States v. Kalter</u>, 5 F.3d 1166, 1168-69 (8th Cir. 1993)(<u>Miranda</u> does not require suppression of spontaneous utterances which are not the product of interrogation).

Accordingly, to the extent that the Defendant challenges his statements to Engum, we recommend that his Motion to Suppress Statements, Admissions, and Answers, be denied.

C.    <u>The Warrantless Search of the Vehicle</u>.

1.    <u>Standard of Review</u>. "Searches without a warrant are per se unreasonable subject to a few well established exceptions." <u>United States v. Hill</u>, 386 F.3d 855, 858 (8th Cir. 2004). One such exception is the automobile exception and, in that context, our Court of Appeals has reiterated:

> As long as law enforcement officials have probable cause, they may search an automobile without a warrant under the automobile exception. See Pennsylvania v. Labron, [518 U.S. 938, 940] (1996); [United States v.] Martinez, 78 F.3d [399] at 401 [(8th Cir. 1996)]. Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place. See Illinois v. Gates, [462 U.S. 213, 238] (1983).

<u>United States v. Fladten</u>, 230 F.3d 1083, 1085 (8th Cir. 2000).

Of course, "[p]robable cause demands not that an officer be 'sure' or 'certain' but only that the facts available to a reasonably cautious man would warrant a belief 'that certain items may be contraband or stolen property or useful as evidence of a crime.'" Id.

"It is the characteristic mobility of all automobiles, not the relative mobility of the car in a given case, that * * * allows for warrantless searches when probable cause exists." United States v. Perry, 925 F.2d 1077, 1080 n. 4 (8th Cir. 1991), cert. denied, 502 U.S. 849 (1991), citing United States v. Ross, 456 U.S. 798, 804-809 (1982); see also, United States v. Blaylock, 535 F.3d 922, 926 (8th Cir. 2008), petition for cert. filed (U.S., March 30, 2009)("No exigency beyond that created by the ready mobility of an automobile is required for a warrantless search of a car to fall within the exception."), citing Pennsylvania v. Labron, supra at 940. In addition, warrantless searches are permitted because "the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." United States v. Blaylock, supra at 926, quoting South Dakota v. Opperman, 428 U.S. 364, 367 (1976).

    2.    <u>Legal Analysis</u>. The Defendant argues that the warrantless search of the Suburban violated his constitutional rights, because the canine did not "alert"

on the exterior of the vehicle. See, <u>Defendant's Memorandum in Support</u>, supra at p. 8 ("The officers * * * were not justified in continuing with a canine search of the inside of the vehicle after the dog failed to alert on the outside of the vehicle * * * ."). Accordingly, the Defendant seeks the suppression of both the marijuana, and the handgun, which were found during the officers' subsequent search of the Suburban.

We note, as a threshold matter, that "a canine sniff of the **exterior** of personal property in a public location 'is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure' that it does not constitute a 'search' within the meaning of the Fourth Amendment." <u>United States v. $404,905.00 in U.S. Currency</u>, 182 F.3d 643, 647 (8th Cir. 1999)[emphasis added], cert. denied, <u>sub</u> <u>nom.</u> <u>Alexander v. United States</u>, 528 U.S. 1161 (2000); see also, <u>United States v. Hill</u>, supra at 858 ("Our court has held that a canine sniff of the exterior of a vehicle does not constitute a search subject to the Fourth Amendment's strictures."), citing <u>United States v. $404,905.00 in U.S. Currency</u>, supra at 647. Moreover, once the canine alerts on the exterior of a vehicle, the officers have "probable cause to search" that vehicle. <u>Id.</u> at 647, citing <u>United States v. Bloomfield</u>, supra at 919. However, as underscored by the Defendant, the Record establishes that the canine did **not** alert on the exterior of the Suburban, and

the Government concedes the point. See, Government's Memorandum in Opposition, Docket No. 35, at p. 2 of 4 ("While Trooper Engum thought the K9 alerted on the outside of the vehicle, it is clear that the K9 did not.").

Nonetheless, we find no constitutional violation, based upon the interior dog sniff, or the hand-search by the officers, because we conclude that the warrantless search was permissible, pursuant to the automobile exception.[10] As noted, Engum

------------------------

[10]The Government contends that the warrantless search of the vehicle was permissible, pursuant to the Supreme Court's recent decision in Arizona v. Gant, --- U.S. ---, 129 S. Ct. 1710 (2009). See, Government's Memorandum in Opposition, Docket No. 35, at p. 3. In Gant, the Court addressed the constitutionality of vehicular searches that are incident to arrest, and it held that "[p]olice may search a vehicle incident to a recent occupant's arrest **only** if the arrestee is within reaching distance of the passenger compartment at the time of the search **or** it is reasonable to believe the vehicle contains evidence of the offense of arrest." Id. at 1723 [emphasis added].

Here, the Government argues that Engum was entitled to conduct a warrantless search of the vehicle because he "had reason to believe that evidence **of a crime** (possession of marijuana) would be found inside the vehicle." Government's Memorandum in Opposition, supra at p. 4. However, Gant authorizes a warrantless search only when there is a reasonable belief that the vehicle contains evidence **of the offense of arrest**. See, Arizona v. Gant, supra at 1723. In his testimony, Engum averred that the Defendant was not formally arrested until the handgun was discovered, during the warrantless search of the vehicle -- in other words, the Defendant was **not** arrested for the possession of marijuana, nor was he arrested prior to the vehicle search. Indeed, we find no basis to conclude that the warrantless search was permissible as a search incident to an arrest. As a result, we find the Gant decision to be inapposite to the circumstances presented, and we do not address it further.

smelled freshly burned marijuana when the passenger window was first opened,[11] and the Defendant subsequently produced a marijuana grinder, rolling papers, and approximately six (6) grams of marijuana, all prior to the arrival of the canine unit on the scene.  As a result, probable cause existed to search the vehicle, independent of any dog alert on the outside of the Suburban.  See, United States v. Davis, 569 F.3d 813, 817-818 (8th Cir. 2009)("If there had been any doubt about whether the smell of smoldering cannabis constituted probable cause to search the vehicle, such doubt was obviated by the discovery of a bag of marijuana in [the Defendant's] pocket."); United States v. Peltier, 217 F.3d 608, 610 (8th Cir. 2000)(holding that, during the course of a lawful stop for missing license plates, "the smell of marijuana gave the deputy probable cause to search Peltier's truck for drugs."), citing United States v. McCoy, 200 F.3d 582, 584 (8th Cir. 2000), United States v. Neumann, 183 F.3d 753, 756 (8th Cir. 1999), cert. denied, 528 U.S. 981 (1999), and United States v. Caves, 890 F.2d

---

[11]The Defendant argues that Engum's assertion, that he smelled marijuana, is not credible, because the canine did not alert on the exterior of the vehicle.  However, Engum testified that he smelled marijuana when the passenger window was opened, and here, there is no evidence that the vehicle's windows were open when the canine sniffed the vehicle's exterior.  As noted, Engum repeatedly and consistently testified that he smelled freshly burned marijuana when the passenger window was first opened, despite thorough cross-examination, and we find his testimony, in this respect, to be credible.

87, 90-91 (8th Cir. 1989); <u>United States v. Cotton</u>, 59 Fed.Appx. 910, 911 (8th Cir. 2003)("[A]n officer who smells burnt marijuana coming from a vehicle has probable cause to search the vehicle for drugs[.]").  Although a preliminary dog sniff was conducted, the officers were entitled to conduct a hand search of the Suburban, even before the canine alerted to the center console.[12]

As a result, no constitutional violation occurred, as a result of the warrantless vehicle search, and we recommend that the Defendant's Motion to Suppress Evidence be denied, in its entirety.

NOW, THEREFORE, It is --

RECOMMENDED:

---

[12]We do not overlook the Defendant's argument that Engum's assertion of a dog alert necessarily undermines Engum's credibility.  We disagree.  Engum made it clear that he was not the dog's manager, and that he thought the dog's handler, Walker, had told him that the dog had alerted at several locations on the exterior of the Suburban. Nevertheless, during cross examination, Engum read into the Record that portion of Walker's report, see <u>Defendant's Exhibit 2</u>, which contained Walker's assertion that his dog did not alert on the outside of the vehicle.  While Engum was wrong on this score, we find the error plausible given the fact that the dog was not managed by him, and he would have had no apparent way of knowing what the dog demonstrates as an "alert."  The simple fact is, however, that even without the alert, Engum had ample probable cause, in view of the smell of freshly burnt marijuana, the Defendant's volunteering of the marijuana grinder, rolling papers, and six (6) grams of marijuana, to believe that the interior of the Suburban contained further evidence of marijuana use.

1.    That the Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 21] be denied.

2.    That the Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 22] be denied.

Dated:  August 10, 2009                          *s/Raymond L. Erickson*
                                                 Raymond L. Erickson
                                                 CHIEF U.S.  MAGISTRATE JUDGE

**NOTICE**

Pursuant to Rule 6(a), Federal Rules of Civil Procedure, D. Minn. LR1.1(f), and D. Minn. LR72.2(b), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties by no later than **August 27, 2009**, a writing which specifically identifies those portions of the Report to which objections are made and the bases of those objections.  Failure to comply with this procedure shall operate as a forfeiture of the objecting party's right to seek review in the Court of Appeals.

If the consideration of the objections requires a review of a transcript of a Hearing, then the party making the objections shall timely order and file a complete transcript of that Hearing by no later than **August 27, 2009**, unless all interested parties stipulate that the District Court is not required by Title 28 U.S.C. §636 to review the transcript in order to resolve all of the objections made.