# UNITED STATES DISTRICT COURT

# DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>JEFFREY LEE DOLSON,<br><br>Defendant. | Criminal No. 09-142 (JRT/RLE)<br><br>**MEMORANDUM OPINION AND ORDER REJECTING REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE AND GRANTING MOTIONS TO SUPPRESS EVIDENCE** |

Clifford B. Wardlaw, Assistant United States Attorney, **UNITED STATES ATTORNEY'S OFFICE**, 600 United States Courthouse, 300 South Fourth Street, Minneapolis, MN 55415, for plaintiff.

Douglas Olson, Assistant Federal Public Defender, **OFFICE OF THE FEDERAL DEFENDER**, 300 South Fourth Street, Suite 107, Minneapolis, MN 55415, for defendant.

Defendant Jeffrey Lee Dolson has objected to a Report and Recommendation issued by United States Magistrate Judge Raymond L. Erickson on August 10, 2009. After a *de novo* and thorough review of those objections and the entire record of this case, *see* 28 U.S.C. § 636(b)(1); Fed. R. Crim. P. 59(b)(3); D. Minn. Local Rule 72.2(b), the Court rejects the Report and Recommendation and grants the motions to suppress for the reasons set forth below.

## BACKGROUND

At approximately 7:38 pm on February 23, 2009, Minnesota State Highway Patrol Trooper Michael Engum stopped a Chevrolet Suburban driven by Jeffrey Lee Dolson.

(DVD of squad car dash camera videorecording, Docket No. 27, Ex. 1; Hearing Tr., Docket No. 37, at 8-10.) Dolson does not contest the legality of the traffic stop, conceding that the vehicle was missing a front license plate. (Docket No. 40 at 3, 8-13.) Pursuant to the stop, however, Trooper Engum instructed Dolson to exit the vehicle and began questioning him about marijuana. Trooper Engum then placed Dolson in the back of the squad car, where Dolson eventually produced approximately six grams of marijuana and some drug paraphernalia. A canine unit later arrived and the canine eventually alerted on the front console between the driver's seat and front passenger seat of Dolson's vehicle, where Trooper Engum subsequently discovered a firearm. As a result, the government charged Dolson with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1) and 924(a)(2). (Indictment, Docket No. 1 at 1.)

On July 2, 2009, Dolson filed two motions to suppress. The first is a motion to suppress evidence obtained as a result of search and seizure. (Docket No. 21.) The second is a motion to suppress statements, admissions, and answers made by Dolson. (Docket No. 22.) On July 15, 2009, the Magistrate Judge held a hearing on the motions. (Docket No. 27.) In that hearing, Trooper Engum testified about the events during the traffic stop, and during his cross-examination a DVD of the videorecording from Trooper Engum's squad car dash camera was played, received, and admitted into evidence. (Docket No. 37 at 7, 57-58, 68-69; Docket No. 39 at 3 n.3.) The Magistrate Judge recommended that the Court deny the motions to suppress, concluding that the initial stop was justified, the length of the stop was not unnecessarily prolonged, that Dolson's Fourth Amendment rights were not violated, and that no *Miranda* warning was required

because Dolson was not in custody prior to the discovery of the handgun. (Docket No. 39.)

The Court's initial analysis focuses on the credibility of Trooper Engum's testimony. The Court draws upon three sources of evidence to assess Trooper Engum's credibility: his testimony in the suppression hearing, the DVD from the squad car camera, and, to a lesser extent, the canine handler's report, which was read into evidence during the suppression hearing. (Docket No. 37 (Transcript); Docket No. 40, Ex. 1 (DVD).) For the sake of clarity, the Court first provides Trooper Engum's description of the events, as he presented them on direct examination during the suppression hearing and during the portions of his cross-examination that corroborate and clarify his direct examination. Then the Court reviews the other evidence in the record.

### A.     Trooper Engum's Initial Version of Events

On the evening of February 23, 2009, Trooper Engum was parked on the shoulder of Highway 89 facing north. (Docket No. 37 at 8-9.) After witnessing a Chevrolet Suburban with no front license plate, in violation of state law, Trooper Engum initiated a U-turn, activated his lights, and pulled over the Suburban. (*Id.* at 9.) Trooper Engum testified that it was a cold and windy evening, with a wind chill temperature of approximately twenty degrees below zero. (*Id.* at 39.) He walked up to the passenger window, and when the window opened he "noticed a fresh odor of burnt marijuana." (*Id.* at 10.) He repeatedly confirmed under cross-examination that he noticed the odor of marijuana on his first trip to the car, when the window was first rolled down. (*Id.* at 40-42.)

Trooper Engum testified that there were two adults and two children in the vehicle. (*Id.* at 11.) Dolson was sitting in the driver's seat, and the children "were not belted and they were playing in the area between the second row seats and the first row of seats of the vehicle." (*Id.* at 10-11.) Dolson's girlfriend or fiancée was seated in the front passenger seat. (*Id.* at 40.) Trooper Engum testified that he questioned Dolson and the front-seat passenger about where they were going and what they were doing. (*Id.* at 41.) They explained that they were driving to Bemidji to have dinner. (*Id.*)

Trooper Engum described Dolson's behavior during this first encounter:

> The driver was moving about in the vehicle. He was shifting in the seat. At one point in time he actually turned perpendicular and was on a knee in his seat facing me and was moving about in his driver's seat as I was talking about the no front license plate, the child restraint issues. He actually worked on doing a 180 in the driver's seat to face back towards the kids but he was sitting up, back down to a seating position moving about in the vehicle.

(*Id.* at 11-12.) When prompted on direct examination, Trooper Engum agreed that Dolson appeared nervous during this initial contact. (*Id.* at 12.)

Trooper Engum testified that he had been familiar with Dolson's criminal history and recognized Dolson's name when he reviewed Dolson's identification during this initial encounter. (*Id.*) Trooper Engum knew that Dolson was "a convicted violent felon" and Trooper Engum had "information that he was conducting criminal activity and known to be, in a sense, a leader of some criminal activities." (*Id.*) Trooper Engum had not had any previous encounters with Dolson, but he knew of him through "intel from law enforcement investigations and investigators." (*Id.* at 32.)

Trooper Engum inquired about proof of insurance and ownership of the vehicle. (*Id.* at 13.) According to Trooper Engum, "the two adults claimed ownership of the vehicle but yet the vehicle was not registered to them and [they had] no proof of insurance of the vehicle." (*Id.*) When confronted with the fact that the vehicle was registered to someone else, "[t]hey explained that they purchased the vehicle but it had been parked in a . . . snowbank up at their residence and they had not been using it up to just prior." (*Id.*)

Trooper Engum testified that he took the following steps after smelling marijuana during his first encounter with the occupants of the vehicle: "After I smelled the marijuana, [I] went back to my car to do some paperwork, run driver's license checks, and at that time I asked for a canine assistance from Beltrami County Sheriff's Department." (*Id.* at 13-14.) On cross-examination, he also confirmed this sequence of events:

> Q:     All right. Now, so on your first time up to the car, you noticed this odor of marijuana, right?
>
> A:     Yes, sir.
>
> Q:     And then you went back to your squad car and you did some processing but when you went back to the squad car, one of the first things you did was you ordered the canines, right?
>
> A:     Best of my knowledge, yes, sir.

(*Id.* at 41-42.)

Trooper Engum testified that after he called for the canine unit and did his paperwork, he re-approached the vehicle and decided to separate Dolson from the vehicle. (*Id.* at 14.) He explained that he made that decision

in the sense that there was a controlled substance in the vehicle. I did not want the opportunity for the subject to flee in the vehicle to destroy evidence in any such manner that I simply asked him to come back so I could explain the citations to separate him from the vehicle before I explained the fact that I noticed the odor of controlled substance.

(*Id.*)  He testified that he went to the driver's side window and asked Dolson "if he'd come back to the front of my squad car so I could explain the citations to him." (*Id.* at 15.)  He testified that at this point he had already written out "a warning for the no front license plate and a Minnesota citation for the no proof of insurance in hand." (*Id.* at 48.)

Trooper Engum testified that as Dolson exited the vehicle, Trooper Engum observed a knife with a six-inch blade on the driver's side floor mat of the vehicle. (*Id.*)

Trooper Engum testified that Dolson exited the vehicle and then Trooper Engum asked Dolson "to come back to the front of my squad so we were not in the roadway area and we were on the shoulder." (*Id.*)  Then he asked Dolson "if he'd place his hands on the hood of my squad car." (*Id.* at 16.)  According to Trooper Engum, Dolson then, "in a sense, kind of squared up with me in the fact that he stated – when he squared up with me, he stated no, I will not be searched and squared up with me on the shoulder of the road." (*Id.*)  Trooper Engum testified that Dolson appeared to be upset and "was showing signs of – that there could be a conflict where he was going to attempt to – fail to follow my legal actions there and asked him to put his hands on the hood of the car and that he wanted to become combative." (*Id.*)

Trooper Engum testified that "[d]ue to the fact of knowing the nature of the subject's history, I started to clear my service weapon from its holster." (*Id.* at 16-17.)  Trooper Engum testified that before he could actually point his weapon at Dolson,

Dolson complied and placed his hands on the squad car. (*Id.* at 17.) On cross-examination, Trooper Engum provided the following testimony about this encounter:

> Q: And th[en] you asked him to put his hands on the hood of the car, right?
>
> A: Correct, sir.
>
> Q: And then you say that he squared off with you?
>
> A: He does, sir.
>
> Q: And what do you – describe how he squares off with you?
>
> A: He turns 90 degrees to me and says that I'm not searching him.
>
> Q: Okay. And then you started unholstering your weapon?
>
> A: That is correct.
>
> Q: And then he complied with your request and put his hands on the squad car, right?
>
> A: Correct, sir.

(*Id.* at 50.)

Trooper Engum testified that during the pat-down he felt "a hard cylinder type object in [Dolson's] front pocket," but he did not remove the object or anything else from Dolson's person. (*Id.* at 17-18, 50.) He also testified that during the pat-down he "advised [Dolson] that [he] smelled the odor of marijuana coming from his vehicle." (*Id.* at 18.) Trooper Engum conceded that Dolson denied that there was an odor of marijuana coming from the Suburban. (*Id.* at 51-52.) Trooper Engum testified that after the pat-down search he "asked [Dolson] if he'd be willing to take a seat in the back seat of my squad car and he walked back towards the rear of my squad car towards the back seat." (*Id.* at 18.)

Trooper Engum testified that he asked Dolson whether anyone had "smoked marijuana in his motor vehicle . . . , and I believe his quote was a couple of my homies or home boys had smoked in it last night or yesterday, made reference to the day prior." (*Id.* at 18-19.) Trooper Engum conceded that in his police report he had inaccurately represented the chronological order of this question and the pat-down, stating that he asked this question **prior to** the pat-down, when in fact it occurred **after** the pat-down. (*Id.* at 25-26.) Trooper Engum testified that when he asked this question about marijuana use in the Suburban, Dolson "was not seated yet. He was at my back door prior to being seated." (*Id.* at 29.)

Trooper Engum testified that he "opened the back seat [door] and [Dolson] took a seat on his own." (*Id.* at 18.) He testified that Dolson "produced a marijuana grinder when he sat down in my car . . . and rolling papers." (*Id.* at 20.) He clarified that at the time Dolson produced the grinder and rolling papers, Dolson was seated but the door had not yet been shut. (*Id.* at 56.) Trooper Engum testified that once Dolson was seated in the back of the squad car and the door was closed, Dolson was locked in and was not free to get out. (*Id.* at 55-56.)

Trooper Engum testified that "[w]hen [Dolson] was in my back seat, [Trooper Engum told Dolson] that – at that point in time he wasn't under arrest. Prior to the vehicle search, he wasn't under arrest and that he – if there's nothing in the vehicle, that he'd be cited and released." (*Id.* at 24.)

Trooper Engum testified that Dolson asked him not to search his vehicle and insisted that Trooper Engum did not have the right to search the vehicle. (*Id.* at 19.) In

response, Trooper Engum told Dolson that he had requested a canine and "we were probably going to do a vehicle search with the fact that the odor of marijuana and that a canine was en route." (*Id.* at 19.) Trooper Engum testified that Dolson then "offered to give me all of his drugs if I would agree to him not to search his vehicle," and then produced a bag of marijuana weighing approximately six grams. (*Id.* at 19-20.) He confirmed that at this point "[t]he door was shut and [Dolson] was locked in the back seat when he gave [Trooper Engum] the marijuana." (*Id.* at 56.)

The canine handler, Deputy Jared Walton, eventually arrived, and Trooper Engum testified that the canine search took approximately three minutes. (*Id.* at 21, 54.) Trooper Engum was not involved in the canine search; during the search he "was sitting in the front seat of [his] squad car." (*Id.* at 36.)

Trooper Engum testified that Deputy Walton "walked his canine around the vehicle several times. After that proceedings [sic] were done, he indicated the fact that the dog indicated on the vehicle and – indicated on several areas of the vehicle."[1] (*Id.* at 21.) Trooper Engum's police report was consistent with this testimony. The report states that "the canine alerted on the outside of the vehicle." (*Id.* at 36.)

Trooper Engum testified that he made the decision to conduct a thorough search of the Suburban "[a]fter the canine advised me the – the canine alerted on it, due to the fact that the odor of marijuana, the marijuana produced from the subjects [sic], considering all those facts, I believe we had probable cause to search the vehicle." (*Id.* at 33.) He

---

[1] A drug-sniffing canine is trained to "indicate," or give a signal, when it senses that illicit drugs are present. *See, e.g.*, *United States v. Mahler*, 141 F.3d 811, 813 (8th Cir. 1998).

"explained to [Deputy Walton] that we were going to do a vehicle search, a hand search of the vehicle and [then the officers] conducted a search of the vehicle." (*Id.* at 21.) He testified that the purpose of the search was "[f]urther trying to locate the other controlled substance, what the canine alerted to." (*Id.* at 22.)

Under cross-examination, Trooper Engum testified as follows:

Q:   . . . [I]n your complete detail and accurate report you indicated that the canine alerted on the outside of the vehicle.  Is that right?

A:   That is what the handler [Deputy Walton] explained to me.

Q:   And that's based on your discussions with Deputy Walton?

A:   That is correct, sir.

Q:   And when did those discussions take place that he told you it alerted on the outside of the vehicle?

A:   Prior to the search.

Q:   Okay.  And was there – there wasn't going to be a search of the inside of the vehicle if the dog didn't alert on the outside, right?

A:   That would have had to have been discussed at the time because of the fact that I had the fresh burnt odor of marijuana and the marijuana on the person.  I would have had to consider those facts but they didn't have to be considered due to the fact that my observations were confirmed by the canine.

Q:   Because the canine alerted on the outside of the vehicle, right?

A:   Correct, sir.

Q:   All right.  After the canine alerted on the outside of the vehicle, then the dog ended up searching the inside of the vehicle, right?

A:   Correct, sir.

(*Id.* at 36-37.)

Trooper Engum testified that then the canine searched the interior of the vehicle. (*Id.* at 37.) He testified that, "[f]rom [his] seated position[, Trooper Engum saw that] the handler allowed the canine to enter the driver's compartment and the rear hatch compartment of the vehicle to search." (*Id.* at 37-38.)

The officers then conducted a hand search of the vehicle. In conducting the hand search, the officers found traces of marijuana, and then Trooper Engum discovered a firearm "wedged between the driver's seat and the plastic center console device." (*Id.* at 22-23.) Trooper Engum then returned to the squad car to place Dolson under arrest. (*Id.* at 23-24.)

## B.     Trooper Engum's Responses Under Cross-Examination and the Court's Factual Findings Relating to the Stop

The following factual recitation is based on the Court's review of the videorecording and the transcript of Trooper Engum's testimony. Unless otherwise stated, all times are based on the clock appearing in the videorecording.

At 19:38:45, Trooper Engum's squad car came to a stop behind the Suburban. Seven seconds later, Trooper Engum exited the squad car. At 19:39:03, he squared himself in front of the front passenger window of the vehicle. He remained in front of the passenger window for approximately one minute and twenty seconds. Trooper Engum was not wearing his microphone during his first two contacts with the occupants of the vehicle, so the videorecording lacks audio for those first encounters with the occupants. He maintained while viewing the videorecording under cross-examination that during the first encounter he smelled the odor of burnt marijuana. (*Id.* at 60-61.)

At 19:40:22, Trooper Engum stepped away from the passenger side of the vehicle and immediately walked around to the driver's side of the vehicle. At 19:40:35, he directed the beam of his flashlight toward the lower outside portion of the front windshield on the driver's side of the vehicle, where the Suburban's Vehicle Identification Number ("VIN") would be found.[2] He focused on that location for approximately fourteen seconds. Trooper Engum confirmed under cross-examination, when viewing the videorecording, that he could have been checking the VIN at this time. (*Id.* at 60.) This was the only time during the videorecording when Trooper Engum inspected that part of the vehicle.

Trooper Engum did not radio for a canine unit when he returned to his squad car after his first contact with Dolson. At 19:41:08, Trooper Engum entered his squad car and then initiated a telephone conversation that he did not mention on direct examination. Trooper Engum testified that this conversation was a telephone call he made to Rob Billings and Gary Peterson of the Headwaters Trails Task Force.[3] (*Id.* at 45.) He testified that he made this call after his initial contact with Dolson and before he returned to the Suburban. (*Id.*) Trooper Engum testified that he contacted Billings and Peterson

_____

[2] 49 C.F.R. § 565.4(f) requires that passenger vehicles such as the Chevrolet Suburban display the vehicle's Vehicle Identification Number ("VIN") so that it is "readable . . . through the vehicle glazing . . . by an observer . . . whose eye-point is located outside the vehicle adjacent to the left windshield pillar."

[3] According to the official Beltrami County, Minnesota web page, "the federal government has stepped up its efforts to enforce the laws regarding drug trafficking, violent crimes and gangs with the formation of the Headwaters Safe Trails Task Force based out of the FBI office in Bemidji." Paul Bunyan Task Force – History, Beltrami County, Minnesota, http://www.co.beltrami.mn.us/Departments/LawEnforcement/
task_force_history.html, last visited Oct. 11, 2009.

"to allow them to be aware of what was taking place due to the fact of another ongoing investigation." (*Id.*) He testified that he told them "[t]hat [he] had Mr. Dolson stopped," and that he contacted them "[t]o plainly be aware that [he] was out with Jeff Dolson because it could pertain to another ongoing investigation that was being conducted at that time." (*Id.* at 45-46.)

On cross-examination, before being confronted with the videorecording of the call, Trooper Engum responded to the following questions about the telephone call:

Q: Did they ask you what you had encountered in terms of violations?

A: They advised – they asked to be advised – to advise them when I was clear. That's all they asked.

Q: Did they ask you what you had on Dolson at the time or what it was you were going to ticket him for?

A: No, sir.

Q: Did they ask you if you had enough information to search the car at that moment?

A: No, sir.

Q: Did they ask you if you had probable cause to search the car?

A: No, sir.

Q: Did you tell them that – did you tell them words to the effect that you didn't have anything on Mr. Dolson other than nervousness at the time?

A: I don't recall that at all, sir.

Q: Did you tell them that you were just going to pinch them for no child seat?

A: No. I don't recall that.

(*Id.* at 46-47.)

Dolson's attorney then played the videorecording of the telephone conversation. At 19:41:47, approximately forty seconds after Trooper Engum entered the squad car, his voice is audible on the videorecording. Because Trooper Engum was speaking by telephone, rather than on the police radio, only his voice is audible. (*See id.* at 44-45.) In the videorecording he stated:

> I'm out with Jeffrey Dolson. [pause] He's nervous as a whore in church. [pause] Uh, blueish-gray uh Chevy Suburban. [pause] Yep. [pause] It's uh registered to a Jeremy Kowski, Kookski? 28 of Sam Edward North, 0-1-1, from Minneapolis. [pause] Um-hm. [long pause] Other than nervousness, not right now. Got two kids in the car and got uh, his uh, wife or girlfriend. I'm gonna pinch him for no child seat. But uh. [pause] Okay. [long pause] Okay. All right. See ya.

At 19:43:11 the conversation terminated.

Dolson's attorney then questioned Trooper Engum about the call:

Q: So . . . Trooper Engum, what we went through right there, that was the telephone call that you made to Headwaters Task Force, right?

A: Correct, sir.

Q: That conversation with the Headwaters Task Force, now, who are you talking to?

A: Like I said, I believe it's Deputy Billings and I believe he is with Peterson but I'm uncertain.

Q: All right. And you were talking with – you said I got – you basically started out to say I got Dolson here, right?

A: I have stopped Dolson, yep.

Q: All right. And then they ask you what do you have on him, right?

A: That point in time the child seat issue.

Q: You told them other than nervousness, nothing, right?

A: I don't have anything in hand at this time, no, sir.

Q:      All right.  That's because you hadn't smelled any marijuana coming from the car, right?

A:      Absolutely not.  What I have there is a child restraint at hand.  I have nothing more than the odor in my nose and a child restraint at hand.

Q:      All right.  You made no mention to these task force officers that you smelled any marijuana in the car, right?

A:      I advised them that I'd get back to them when it was all said and done with what was conducted of the stop.

Q:      My question for you is you made no mention of the odor of marijuana to these task force officers, right?

A:      Odor of marijuana doesn't mean that there's product.  It means that it was burnt marijuana.  If there's product left or not that doesn't mean I have nothing.

Q:      Okay.  So at this point in time you have nothing other than nervousness, right?  Is that an accurate statement that you told these officers?

A:      I have nothing – nervousness and a child restraint for offenses but I have the odor of burnt marijuana, sir.

Q:      And at this point in time it was your intention simply to pinch him for no child seat, right?

A:      And work off the no – or the odor of no – or odor of marijuana and see where that produces.

Q:      Okay.  So at this point in time other than this child – no child seat, you agree with me that you didn't have probable cause to search the vehicle, right?

A:      I have articulus [sic] suspicion to call for a canine.

Q:      Okay.  And after this, then you call for the canine, right?

A:      I believe so.  Yes, sir.

(*Id.* at 61-63.)  He denied getting any instructions from the Task Force "as to what to do in connection with Dolson."  (*Id.* at 63.)

Under cross-examination, Trooper Engum testified that prior to asking Dolson to step out of the Suburban, he returned to the Suburban for the second time to verify the vehicle registration and to check the VIN plate to determine whether it matched the registration:

> A:     I went back up and confirmed the fact that they claimed ownership of the vehicle due to the fact that when I ran the registration of the vehicle, it was registered to a Jeremy Kookski I believe is how it's pronounced.  I then went over to the driver's side and checked the VIN plate to see if the VIN plate matched the registration of the vehicle, and then I proceeded back to my squad car.
>
> Q:     Okay.  So you went to – now, is this your second time to the car?
>
> A:     That is correct.

(*Id.* at 42-43; *see also id.* at 43-44 (confirming sequence).)  Trooper Engum explained that during his telephone conversation with the Task Force he "was multitasking and . . . ran a . . . driver's license check and a vehicle check and that's when the vehicle check came back to show it registered to Jeremy Kookski . . . .  So that's why I returned to the vehicle to inquire about the ownership and check the VIN number [sic]."  (*Id.* at 47.)  He testified that during his second approach to the car he "circle[d] out on the outside of the vehicle and shine[d] [his] flashlight in and check[ed] what the VIN number [sic] was."  (*Id.*)  As noted above, however, the videorecording shows that Trooper Engum examined the vehicle's VIN plate during his **first** contact with the vehicle, prior to the telephone conversation with the Task Force.

The videorecording shows that Trooper Engum did make contact with the Suburban a second time before he asked Dolson to step out of the vehicle.  At 19:45:13, Trooper Engum exited the squad car for a second time, and at 19:45:25 he again squared

himself in front of the passenger window. There is no audio recording of this conversation. During the second contact, Trooper Engum spent approximately forty seconds in front of the passenger window, and then he returned directly to the squad car. During this contact, he did not examine the Suburban's VIN plate at this time and he did not ask Dolson to step out of the Suburban.

Trooper Engum did not radio for a canine unit until he returned to his squad car after his second contact with the Suburban. At 19:46:28, after returning to his squad car for a second time, Trooper Engum initiated a radio call by stating "165-81." Ten seconds later, he requested a canine unit. When confronted with the videorecording, Trooper Engum conceded that he waited to radio for the canine unit until after his second contact with the Suburban. (*Id.* at 64.)

Trooper Engum's microphone was activated during his third contact with the occupants of the vehicle. At 19:53:33, he asked Dolson, "Why don't you jump out for me for a second?" Dolson complied and proceeded toward the front of the squad car, with Trooper Engum following behind him. At 19:53:51, as the two men were walking toward the squad car, Trooper Engum directed Dolson to "Put your hands up on the hood" of the squad car.

Dolson never confronted Trooper Engum or refused to be searched. The videorecording demonstrates that at first, Dolson stood with his back facing Trooper Engum and extended his arms straight out to the sides, as if preparing to be frisked while standing upright. Dolson then dropped his arms to his sides and turned his head to face Trooper Engum and asked, "Why?" Contrary to Trooper Engum's testimony, Dolson

never stated, "no, I will not be searched." (*Id.* at 16.)  Dolson's only utterance at this point was "Why?"

When Dolson asked "Why," Trooper Engum's right hand was on his sidearm. Dolson then turned his body to face Trooper Engum.  In so doing, his arms were down at his sides and his hands were crossed in front of his groin area.  The videorecording demonstrates that in response to Dolson's question, Trooper Engum stated, "Because I asked you to."  At the same time, Trooper Engum began to clear his sidearm from its holster.

At 19:54:15, Trooper Engum initiated a pat-down search of Dolson.  (*Id.* at 17.) The pat-down concluded at 19:54:33.  On cross-examination, Trooper Engum provided the following testimony about the object in Dolson's front pocket:

Q:     Now, in the pat search you didn't take anything off of him, right?

A:     Not at that time, no, sir.

Q:     All right.  And you didn't find anything that seemed obviously to be a weapon, right?

A:     There was the hard cylinder object and I was going to – he agreed to take a seat in the back seat of my squad car.  He had been tense with me up to that point in time and he had relaxed and he agreed to take a seat so things were – he had deescalated and in his emotions.  So we were walking towards the back seat and I figured that when he – if he'd cooperate and take a seat, then that item could be removed and inspected for a weapon.

Q:     Okay.  It was some small hard item but it didn't seem to be a weapon, right?

A:     It was a hard item approximately two and a half inches around, two inches thick and without removing it, it would be undetermined what it—if it was a weapon or not.  It was metallic.

(*Id.* at 50-51.)

Dolson was not cooperative after the pat-down.  At 19:54:35, after the pat-down search was complete, Trooper Engum placed his right hand on Dolson's right upper arm and stated, "Relax, okay sir?"  Dolson gave a response that is not intelligible on the videorecording.  Then Trooper Engum placed his right hand on Dolson's right forearm and stated, "Relax, you understand?  I'm gonna ask you to take a seat in the back seat of my squad car.  When I stepped up there I smelt [sic] an odor of marijuana.  Burnt marijuana."   In response to this statement, beginning at 19:54:46, the following conversation took place:

| | |
|---|---|
| Dolson: | No way! |
| Engum: | Yes, sir.  All right?  Are you gonna cooperate? |
| Dolson: | No, you're not searching the car, you're not fucking around no more.  Let me go, please. |
| Engum: | No. |
| Dolson: | Can I call an attorney? [Engum shakes his head from side to side.]  Because I'm not takin' [unintelligible]. |
| Engum: | I'm asking you, I'm asking you to cooperate. |

Dolson continued to speak after Trooper Engum asked him to cooperate.

Dolson was seated in the back of the squad car when Trooper Engum began questioning him.  At 19:55:07, Trooper Engum began to place Dolson in the back of the squad car.  At 19:55:11, the squad car door opened, and at 19:55:12, the squad car moved slightly, indicating that the car had taken on additional weight.  Beginning at 19:55:13, the following conversation took place, during which the squad car does not move:

| | |
|---|---|
| Engum: | When's the last time someone smoked marijuana in your car? |

| | |
|---|---|
| Dolson: | I don't know.  My home boys probably did the other night, but I mean. |
| Engum: | Okay.  That's what I mean.  I smelled marijuana.  What is the hard object in your pocket?  The round case? |
| Dolson: | One of those rollers.  It's, it's paraphernalia.  I'm sorry. |
| Engum: | All right. |
| Dolson: | [unintelligible] My girlfriend is pregnant, do we have to really do all this [unintelligible]? |
| Engum: | I'm asking you to cooperate.  If you cooperate . . . . |
| | [sound of a metal object hitting something] |

At 19:56:12, Trooper Engum left the squad car and approached the Suburban for the fourth time.  He asked the woman in the front passenger seat for identification, and then stated:

> Right now, I explained to him, I smelt [sic] the odor of marijuana when I stepped up here.  And he produced a roll and rolling papers for me, okay?  Uh, I've requested a canine, and he's admitted that people smoked marijuana in here.  So after they get here I'm gonna ask you to step back and have a seat in one of our cars to stay warm with your children, okay?

At 19:57:11, Trooper Engum got into the squad car again and then radioed for a second squad car for the passengers to sit in.  At 19:57:58, the following conversation took place between Dolson and Trooper Engum:

| | |
|---|---|
| Dolson: | Could you tell me why you're hassling me? |
| Engum: | You call it hassle. |
| Dolson: | Over a front plate. [unintelligible] |
| Engum: | Okay. |
| Dolson: | [unintelligible] my little grinder, when is this gonna stop? |
| Engum: | It's the odor, it's the odor of marijuana is the reason I asked you to step out, okay?  And in turn, you have a marijuana |

grinder and papers in your pocket, you have a knife on the floor of your vehicle.

Dolson:     If I give you the weed would you leave me alone?

Engum:     Do you have more weed?

Dolson:     [unintelligible] Here.

Engum:     Okay.

Dolson:     But you have to leave me alone.

Engum:     Uh, I'm gonna tell ya . . . .

Dolson:     Just take me to jail just let them go [unintelligible].  What I don't understand is how you [unintelligible] that strong, or

Engum:     That is not very strong, but it was coming out of the car.

Dolson:     Yeah, see, it was . . . .

Engum:     and just right in my face, so . . . .

Dolson:     I'm sorry.

Engum:     All right.

At 19:59:28, Trooper Engum informed Dolson that "we're gonna call for a canine" and that he had probable cause to search the car.  He stated that "probable cause has been made by you having the marijuana in the car and the odor coming from the car."

From the very start, Trooper Engum directed Deputy Walton to conduct a full search of the Suburban.  At 20:02:53, Trooper Engum was outside of the squad car and began speaking with Deputy Walton, who had arrived at the scene.  Trooper Engum reported to Deputy Walton:

I already took, uh, an eighth off of him, and a grinder, um, it's a definite misdemeanor.  He does not want us in that vehicle, adamantly.  Um, I don't, it's, it's a full search, um, I had the marijuana in my face, I asked him to step out, he admitted that people were smoking up a day before in

the car, so he acknowledged the odor, and then he produced the weed out of his pocket and the grinder.

At 20:04:12, Trooper Engum told Deputy Walton, "All right, let's sit and talk to him for a little bit. I'm kinda cold from being outside. So stay warm as we can until we search." Trooper Engum then got back in the squad car and reinitiated conversation with Dolson, asking whether he had any additional marijuana. Dolson assured him that there was no marijuana.

In the videorecording, there is only one discussion between Trooper Engum and Dolson about whether Dolson was under arrest. At 20:06:01, after all of the foregoing events, Trooper Engum stated, "Well, at this point in time, sir, I could arrest you, but I choose that I'm just gonna detain you, okay, and sir if you don't want to be arrested, I mean, I can put handcuffs on you and we can go from there, so."

At 20:06:54, Trooper Engum directed the woman in the Suburban to exit the vehicle with the two children and told her to sit with them in another squad car. Trooper Engum then returned to his squad car and continued to speak with Dolson while Deputy Walton conducted the canine search.

The canine did not alert on the exterior of the vehicle. At 20:09:40, Deputy Walton and his canine approached the front driver's side of the Suburban. Deputy Walton started the canine sniff, and the canine moved quickly in a counter-clockwise direction along the outside of the vehicle. By 20:10:07, the canine had made its first full circle around the vehicle, and Deputy Walton initiated a second pass. By 20:10:57, the canine completed its second circle around the vehicle. The canine did not visibly bark or engage in other behavior suggesting the canine was alerting to the presence of illicit

drugs. Deputy Walton did not tell Trooper Engum that the canine alerted on the exterior of the vehicle. The videorecording shows no communication from Deputy Walton suggesting that the canine alerted on the outside of the vehicle. Deputy Walton's report[4] states, "I used my canine, Kudos, and did an exterior search of the vehicle. Kudos did not indicate on the exterior of the vehicle. I then put Kudos inside the vehicle." (*Id.* at 70.)

Deputy Walton then continued the full search of the vehicle, pursuant to Trooper Engum's initial instructions. At 20:11:05, Deputy Walton opened the driver's door and directed the canine to enter the vehicle. After viewing the videorecording of the canine search, Trooper Engum insisted that "the reason why the canine went inside the vehicle" was that the canine "hit on" the outside of the vehicle. (*Id.* at 68.)

While the canine was in the vehicle, Dolson asked Trooper Engum, "Can I go now?" Trooper Engum responded, "No, not at this time, sir." At 20:14:14, the canine exited the vehicle.

At 20:14:27, Deputy Walton opened the front passenger door and the canine re-entered the vehicle. Contrary to Trooper Engum's testimony, the canine never entered the vehicle through the rear hatch compartment. At 20:14:47, Trooper Engum approached the vehicle. At 20:15:54, Deputy Walton told Trooper Engum that the canine was alerting on the console between the driver's seat and the front passenger seat.

---

[4] The Magistrate Judge admitted Deputy Walton's report into evidence and found "the document to be relevant to [the Magistrate Judge's] overall assessment of [Trooper] Engum's credibility." (Docket No. 39 at 10 n.8.) The Court concurs with the Magistrate Judge's conclusion with respect to Deputy Walton's report.

At 20:16:06, after Deputy Walton told Trooper Engum that the canine was alerting on the console, Trooper Engum walked to the driver's side of the Suburban, opened the driver's door, retrieved the knife, and placed it on the front hood of the squad car. At 20:16:19, Trooper Engum returned to the driver's seat area of the Suburban. At approximately 20:16:49, Trooper Engum discovered the firearm. At 20:17:38, Trooper Engum handcuffed Dolson and formally placed him under arrest.

## DISCUSSION

## I. TROOPER ENGUM'S TESTIMONY IN SEVERAL IMPORTANT RESPECTS IS NOT CREDIBLE.

In examining multiple conflicts between Trooper Engum's testimony and the videorecording and police reports, the Court concludes that several important aspects of Trooper Engum's testimony – particularly those that would support a finding that the search and seizure were lawful and that Dolson was not in custody – are not credible.

### A. The Smell of Burnt Marijuana

Trooper Engum's testimony that he smelled a strong odor of burnt marijuana during his first contact with the Suburban is not credible for several reasons.

First, Trooper Engum was aware that it would take some time for a canine unit to arrive at the location of the stop, yet he waited more than five minutes from the time he first returned to his squad car after allegedly smelling the strong odor of marijuana until he called for the canine unit. As Trooper Engum was undoubtedly aware, unnecessary

delay may transform an investigative stop[5] into a *de facto* arrest, and therefore he was obligated to act promptly in response to the alleged odor. *See United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994) (en banc); *see also United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007) (distinguishing a case in which officers knew that they would need a drug-sniffing dog but "did nothing to ensure one's presence" from one in which the officer called for a drug-sniffing dog "immediately after he developed a reasonable suspicion of narcotics possession").

Second, Trooper Engum failed to mention the alleged odor of marijuana during his first telephone conversation. During the five minutes between his first opportunity to radio for a canine unit and his actual radio call, Trooper Engum had a one-minute and twenty-four second telephone conversation with members of the Headwaters Safe Trails Task Force, which is responsible for enforcing drug trafficking laws. Trooper Engum called them because he knew the Task Force was investigating Dolson. He testified that he contacted them so that they would "be aware that [he] was out with Jeff Dolson because it could pertain to another ongoing investigation that was being conducted at that time." (Docket No. 37 at 46.) If Trooper Engum had in fact smelled a strong odor of burnt marijuana before placing that call, it seems logical to expect that Trooper Engum would have mentioned his findings and his intent to call for a canine unit to the members

---

[5] The Court notes below that the odor of burnt marijuana provides probable cause to search a vehicle for drugs. *See* footnote 6, *infra*. Nonetheless, Trooper Engum's testimony in the suppression hearing confirms that Trooper Engum did not believe that the odor of burnt marijuana, without more, would support a search. (Docket No. 37 at 61-63.) Therefore, prior to the time when Dolson produced the drug paraphernalia and marijuana in the back of the squad car, Trooper Engum was operating under the assumption that the rules for an investigative stop applied.

of the Task Force, because such findings would likely "pertain to" the Task Force's ongoing investigation. *Cf. United States v. Ross*, 300 Fed. Appx. 386, 390 (6th Cir. 2008) (concluding that the officer's testimony that he had smelled marijuana during his first contact with the vehicle was credible because "[w]hen Dettmer returned to his patrol car with Ross's license and registration, he **immediately** told [his partner] Hanes that he had smelled marijuana in Ross's car and intended to investigate further, with her assistance." (emphasis added)). Trooper Engum did not even offer the information after the Task Force asked several questions about the stop, including what Trooper Engum had on Dolson. (See Docket No. 37 at 61.) Instead, Trooper Engum responded, "[o]ther than nervousness, not right now. Got two kids in the car and . . . . I'm gonna pinch him for no child seat." On cross-examination, Trooper Engum denied that the Task Force had asked him whether he had sufficient justification for a canine sniff or probable cause to search the car, (*id.* at 46-47), but he provided no other explanation for his statement, and the Court can think of no other plausible explanation.

Trooper Engum's explanation for his failure to mention the odor of marijuana is inconsistent with what he **did** mention to the Task Force. Trooper Engum explained on cross-examination that he did not mention the odor of marijuana because the odor "doesn't mean that there's product. . . . If there's product left or not that doesn't mean I have nothing." In other words, Trooper Engum believed that the odor of marijuana alone did not provide sufficient justification to ticket Dolson or to search the vehicle. Yet Trooper Engum was undoubtedly aware that **nervousness** alone **also** would not provide sufficient justification to ticket Dolson or to search the vehicle. Nonetheless, he told the

Task Force that Dolson was "nervous as a whore in church" and responded to a question about what he had on Dolson by stating, "Other than nervousness, not right now."  If Trooper Engum was filtering his comments to the Task Force based on whether certain observations would give rise to probable cause, then Trooper Engum would have mentioned neither Dolson's nervousness nor the odor of marijuana.

Third, the remainder of the telephone conversation suggests that the Task Force provided Trooper Engum with more substantive information than Trooper Engum admitted in his testimony.  After Trooper Engum stated, "I'm gonna pinch him for no child seat," there was a pause, then Trooper Engum stated, "Okay," and then there was a very long pause, after which Trooper Engum replied, "Okay.  All right.  See ya." Trooper Engum testified that the only thing the Task Force asked was that Trooper Engum "advise them when I was clear.  That's all they asked." (*Id.* at 46.)  Trooper Engum's testimony is not consistent with the length of the pauses in the videorecording or with Trooper Engum's responses to them.  The Court concludes that the videorecording demonstrates that the Task Force asked or directed Trooper Engum to do something more than simply "advise them when [he] was clear."

Trooper Engum's conduct after completing the call provides further support for the Court's conclusion.  After completing the call, Trooper Engum exited the squad car, had a forty-second conversation with the occupants of the Suburban, and then returned to the squad car to radio for a canine unit.  As discussed in greater detail in the following section, Trooper Engum's testimony about the purpose of this second contact with the Suburban is inconsistent with the videorecording.  The Court concludes that the most

plausible explanation for the purpose of Trooper Engum's second contact with the Suburban was to place some temporal distance between his conversation with the Task Force, in which he stated "[o]ther than nervousness, not right now," and his call for the canine unit. Trooper Engum was undoubtedly aware of two relevant facts: (1) he could lawfully prolong the stop if he needed to investigate the vehicle's registration, and (2) his credibility would be undermined if, immediately after concluding his call with the Task Force, he were to call for a canine unit, because the timing of those calls would give rise to an inference that the Task Force had instructed him to do so.

### B.    The Delay Caused by the Need to Verify the VIN Plate

Trooper Engum's testimony about the purported reason for the delay in calling the canine unit is not credible. Trooper Engum testified that during the telephone conversation with the Task Force he "was multitasking" and ran a vehicle check, prompting him to return to the Suburban to "inquire about the ownership and check the VIN number [sic]." (*Id.* at 47.) Yet the videorecording shows that Trooper Engum verified the VIN plate during his first contact with the vehicle. The Court therefore concludes that Trooper Engum had already run the license plates for the Suburban prior to his first contact with Dolson, and he knew at that time that the vehicle was registered to Jeremy Kookski. Trooper Engum's proffered explanation for his second contact with the Suburban is not consistent with the videorecording.

### C.  Dolson's Refusal to Be Searched

Trooper Engum's alleged justification for withdrawing his firearm from its holster is not consistent with the videorecording.  Contrary to Trooper Engum's testimony, Dolson did not state, "no, I will not be searched."  The Court notes that the videorecording of this sequence of events does not evidence any threatening conduct by Dolson.  It appears that Dolson initially misunderstood Trooper Engum's direction to put his hands up on the hood to be a direction simply to put his hands up, which is what Dolson initially did.  When Dolson turned to face Trooper Engum, he did so gradually, first turning his head to ask "Why," and then turning his torso, with his arms down at his sides and his hands clasped submissively in front of his groin area.  This conduct, which Trooper Engum described as "squaring off," did not demonstrate physical hostility.

### D.  The Cylinder in Dolson's Pocket

Trooper Engum's testimony that he believed the "hard cylinder type object" in Dolson's pocket could have been a weapon is not consistent with Trooper Engum's conduct.  At the time of the pat-down search, Trooper Engum had seen a knife on the floor of the Suburban, so he had reason to suspect that Dolson might have a weapon on his person.  Trooper Engum testified that Dolson "had relaxed and he agreed to take a seat" in the back of the squad car, and therefore Trooper Engum "figured that when he – if he'd cooperate and take a seat, then that item could be removed and inspected for a weapon."  (*Id.* at 50-51.)  Yet during the pat-down search, Dolson had not yet relaxed.  The videorecording demonstrates that twice **after** the pat-down was complete, Trooper Engum forcefully directed Dolson to relax.  If Trooper Engum had believed that the

cylinder was possibly a weapon, he would have removed it during the pat-down, when Dolson had not yet "relaxed" and had not yet "agreed" to sit in the back of the squad car. Moreover, it is implausible to suggest that Trooper Engum would have placed Dolson in the back of the squad car with a weapon still on his person, and that Trooper Engum intended to wait until Dolson was seated before "remove[ing] and inspect[ing]" the alleged weapon.

### E.    Dolson "Agreeing" to Sit in the Back Seat of the Squad Car

Trooper Engum's testimony that he "asked [Dolson] if he'd be willing to take a seat in the back seat of my squad car and he walked back towards the rear of my squad car towards the back seat" exaggerates Dolson's purported willingness to cooperate. Dolson agreed to sit in the squad car only after arguing with Trooper Engum and only after Trooper Engum told him that he was not free to go.  When Trooper Engum reported that he had smelled burnt marijuana, Dolson responded, "No way!"  Then Trooper Engum asked whether Dolson was going to cooperate.  Dolson responded, "No, you're not searching the car, you're not fucking around no more.  Let me go, please."  Trooper Engum responded, "No."  Then Dolson asked if he could call an attorney, and Trooper Engum shook his head, indicating no.  Trooper Engum continued to request that Dolson cooperate, and eventually he did do so, while continuing to protest orally, but only after being told that he was not free to go.

**F.      Trooper Engum Questioning Dolson About Marijuana Use in the Suburban**

Trooper Engum's testimony regarding when he questioned Dolson about the last time someone had smoked marijuana in the Suburban is not credible.  Trooper Engum testified that Dolson "was not seated yet" when Trooper Engum asked, "When's the last time someone smoked marijuana in your car?"  He testified that Dolson produced the grinder and rolling papers "**when he sat down in my car**."   The videorecording demonstrates that Trooper Engum posed the first question at 19:55:13 and that Dolson produced the marijuana grinder at 19:55:38.  The Court has carefully reviewed this portion of the videorecording and concludes that although the squad car did shift down immediately prior to the first question, it did not shift down again during the questioning leading up to the sound of Dolson's marijuana grinder making contact with the back seat of the squad car.  (*Id.* at 20.)  Therefore, the Court concludes that Dolson had taken a seat in the back of the squad car when Trooper Engum initiated questioning.

Trooper Engum's contemporaneous report of the traffic stop demonstrates Trooper Engum's attempt to place this questioning even earlier in the stop.  He testified that he dictated his report at approximately midnight on the evening of the arrest.  (*Id.* at 28.)  The report erroneously stated that Trooper Engum asked the question prior to the pat-down.  (*Id.* at 25-26.)

Trooper Engum also repeatedly mischaracterized Dolson's response to the question in a way that would corroborate Trooper Engum's testimony that he allegedly detected an odor of burnt marijuana coming from the vehicle.  Dolson responded, "I don't know.  My home boys **probably** did **the other night** . . . ."  Trooper Engum told Deputy

Walton that Dolson "admitted that people were smoking up **a day before** in the car." He testified on direct examination that Dolson reported that "a couple of [Dolson's] homies or home boys had smoked in it **last night or yesterday**, made reference to **the day prior**." (*Id.* at 19.) He repeated under cross-examination that he "asked him in a sense when is the last time somebody's smoked marijuana in your vehicle and he replied couple of my homies smoked in it, my recollection, **last night, yesterday**, some nature of **the day before** is the way it came off." (*Id.* at 31.)

### G.     The Canine Search of the Interior of the Suburban

Trooper Engum's testimony that the canine alerted on the exterior of the vehicle, and that the exterior alert provided justification for the interior search, is not credible. The canine did not alert on the exterior of the vehicle, and therefore Trooper Engum's "observations [as to the strong odor of burnt marijuana coming from the vehicle] were [not] confirmed by the canine." (*Id.* at 37.) As confirmed by the videorecording and by Deputy Walton's conduct, Trooper Engum had decided to conduct a full search even before the exterior canine sniff began. In drafting his report and in testifying on direct examination, however, Trooper Engum attempted to use the results of the canine sniff to bolster the factors he allegedly considered in determining whether there was probable cause, when in fact the results were irrelevant.

According to Trooper Engum's testimony, whether the canine alerted on the outside of the vehicle was a critical factor in Trooper Engum's contemporaneous justification for searching the interior of the vehicle. On cross-examination, Trooper Engum confirmed that he made the decision to conduct a thorough search of the car, and

he stated that he made that decision "[a]fter the canine advised me the – the canine alerted on it, due to the fact that the odor of marijuana, the marijuana produced from the subjects [sic], considering all those facts, I believe we had probable cause to search the vehicle, yes, sir." (*Id.* at 33.) The Court concludes that Trooper Engum's proffered justification for the interior search is not consistent with more credible evidence in the record.

### H. Informing Dolson That He Was Not Under Arrest

The timing of Trooper Engum's statement to Dolson that he was not under arrest suggests a post-hoc attempt to muster facts to bolster the argument that there was no *Miranda* violation. Whether a suspect is informed at the time of questioning that he is not considered under arrest is one of several factors courts consider in determining whether the suspect is "in custody" for *Miranda* purposes. *See United States v. Wolk*, 337 F.3d 997, 1006 (8th Cir. 2003). Trooper Engum testified that he informed Dolson "[w]hen he was in my back seat, the fact that – at that point in time he wasn't under arrest. Prior to the vehicle search, he wasn't under arrest[.]" (*Id.* at 24.) Dolson was first seated in the squad car at 19:55:12. At 20:06:01, more than ten minutes later, and after Dolson made several incriminating statements, Trooper Engum told Dolson, "Well, at this point in time, sir, I could arrest you, but I choose that I'm just gonna detain you, okay, and sir if you don't want to be arrested, I mean, I can put handcuffs on you and we can go from there, so." An officer cannot eliminate the effect of a failure to Mirandize a suspect by informing him **after** questioning that he is not under arrest. *See Wolk*, 337 F.3d at 1006 (noting that one factor to consider in determining whether an individual is in

custody is "whether the suspect was informed **at the time of questioning** . . . that the suspect was not considered under arrest" (emphasis added; internal quotation marks omitted)); *cf. United States v. Va Lerie*, 424 F.3d 694, 697 (8th Cir. 2005) (en banc) (noting that on first contact with the defendant, the investigator immediately "informed Va Lerie he was not in trouble or under arrest").

### I.     Summary of Factual Findings Relating to Trooper Engum's Testimony

Each of the aforementioned inconsistencies and mischaracterizations, viewed in isolation, might not undermine Trooper Engum's credibility.  Viewed as a whole, however, they demonstrate that Trooper Engum has – whether deliberately or unintentionally – shaded the facts surrounding the traffic stop in a way that would make the search and seizure less constitutionally suspect than it in fact was.  *Cf. United States v. Portmann*, 207 F.3d 1032, 1033 (8th Cir. 2000) (per curiam).  Therefore, the Court makes the following additional factual findings regarding Trooper Engum's testimony.

The Court concludes that during Trooper Engum's first contact with the Suburban, he did not smell a strong odor of burnt marijuana and he intended only to ticket Dolson for failing to place the children in child restraints.  Trooper Engum offered no credible explanation for the inconsistency between the purported odor of marijuana and his conduct and statements to the Task Force when he first returned to the squad car.  *See United States v. Hatcher*, 275 F.3d 689, 692 (8th Cir. 2001) (per curiam).  The Court concludes that Trooper Engum's references to the odor of marijuana were a pretext for prolonging the stop and for questioning Dolson about drugs.

The Court concludes that the vehicle registration issue did not cause or justify any delay, because Trooper Engum was aware of and investigated the issue during his first contact with the vehicle. Trooper Engum's testimony to the contrary appears to be a post-hoc attempt to justify his delay in calling for a canine unit. The Court concludes that the actual reason Trooper Engum delayed calling for a canine unit was because Trooper Engum did not smell a strong odor of burnt marijuana during his initial contact with the vehicle, and therefore he had no reason to call for a canine unit.

The Court concludes that Trooper Engum was justifiably concerned that Dolson might be armed after he removed Dolson from the vehicle. Nonetheless, after careful review of the videorecording, the Court concludes that Dolson never refused Trooper Engum's directions to place his hands on the hood of the squad car and never conducted himself in a way that manifested any physical threat to Trooper Engum. Trooper Engum's testimony to the contrary constitutes an effort to justify his decision to unholster his sidearm.

The Court concludes that Trooper Engum did not suspect that the cylinder in Dolson's pocket was a weapon. His testimony to the contrary constitutes an effort to justify his interrogation of Dolson about the identity of the object after the pat-down search had been completed and after Dolson had taken a seat in the back of the squad car.

The Court concludes that Trooper Engum exaggerated Dolson's alleged willingness to sit in the back of the squad car. This exaggeration constitutes an effort to characterize the circumstances of Trooper Engum's questioning of Dolson after the pat-down as non-custodial.

The Court concludes that Trooper Engum repeatedly mischaracterized when he questioned Dolson about the last time someone smoked marijuana in the Suburban. In so doing, Trooper Engum attempted to render that question non-custodial. Trooper Engum also repeatedly mischaracterized Dolson's response to the question in a way that would corroborate Trooper Engum's testimony that he smelled a strong odor of burnt marijuana coming from the vehicle.

The Court concludes that Trooper Engum's testimony about the canine sniff of the vehicle exterior is inconsistent with the videorecording and with the canine handler's report. Trooper Engum's testimony represents an effort to present evidence corroborating his claim that he smelled a strong odor of burnt marijuana during his first contact with the vehicle. Trooper Engum's testimony about the importance of the canine allegedly indicating on the exterior of the vehicle also undermines the credibility of his proffered justification for searching the interior of the vehicle.

The Court concludes that Trooper Engum's statement to Dolson informing him that he was not under arrest amounts to a post-hoc attempt to render the interrogation non-custodial.

## II. THE SEIZURE WAS UNREASONABLY PROLONGED, THE AUTOMOBILE SEARCH WAS NOT SUPPORTED BY PROBABLE CAUSE, DOLSON WAS NOT PROPERLY MIRANDIZED, AND SUPPRESSION IS WARRANTED.

The Fourth Amendment states that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *see also Va Lerie*, 424 F.3d at 700. "[T]he Search

Clause is wholly distinct from the Seizure Clause[.]" *Va Lerie*, 424 F.3d at 701. "[A]

Fourth Amendment **search** occurs when an expectation of privacy that society is

prepared to consider reasonable is infringed." *Id.* (internal quotation marks omitted). A

Fourth Amendment **seizure** occurs when there is "meaningful interference, however

brief, with an individual's freedom of movement." *Id.* (internal quotation marks

omitted).

"A traffic stop constitutes a 'seizure' within the meaning of the Fourth

Amendment." *United States v. Fuse*, 391 F.3d 924, 927 (8th Cir. 2004) (internal

quotation marks omitted). "For purposes of constitutional analysis, a traffic stop is

characterized as an investigative detention, rather than a custodial arrest. As such, a

traffic stop is governed by the principles of *Terry v. Ohio*." *United States v. Jones*, 269

F.3d 919, 924 (8th Cir. 2001) (citations omitted). "Under *Terry*, the police can stop and

briefly detain a person for investigative purposes if the officer has a reasonable suspicion

supported by articulable facts that criminal activity may be afoot, even if the officer lacks

probable cause." *United States v. Winters*, 491 F.3d 918, 921 (8th Cir. 2007) (internal

quotation marks omitted). "This includes the right to briefly stop a moving automobile to

investigate a reasonable suspicion that its occupants are involved in criminal activity."

*Id.* (internal quotation marks omitted). "Following a valid *Terry* stop, . . . if the officer

has a reasonable, articulable suspicion that the person is armed and dangerous" the officer

may request that the person exit the vehicle so that "the officer may conduct a limited

pat-down search of the individual's outer clothing for the purpose of uncovering

concealed weapons." *See United States v. Gilliam*, 520 F.3d 844, 847-48 (8th Cir. 2008).

"This search must be conducted in the least intrusive means reasonably necessary to dispel the risk of danger to the officers." *Id.* at 848.

Dolson does not contest the legality of the initial traffic stop in his objections to the Magistrate Judge's Report and Recommendation. (*See* Docket No. 40.) *See also United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2009) (articulating the standards for an investigatory stop of a vehicle); *id.* at 720 ("[A]ny traffic violation provides probable cause for a traffic stop."). Therefore, the Court begins its analysis with whether the traffic stop became an unlawful seizure. *See Illinois v. Caballes*, 543 U.S. 405, 407 (2005) ("[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution.").

### A. The Seizure Was Unnecessarily Prolonged and Not Supported by Reasonable Suspicion.

"We consider both the length of the detention and the efforts of police to conduct their investigation quickly and unintrusively in determining whether a detention is reasonable in the context of an investigative stop[.]" *Bloomfield*, 40 F.3d at 916. "[A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *United States v. Binion*, 570 F.3d 1034, 1040 (8th Cir. 2009) (internal quotation marks omitted). "The scope of the detention must be carefully tailored to its underlying justification." *Jones*, 269 F.3d at 924 (internal quotation marks omitted). "[T]he investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short

period of time." *United States v. Sanchez*, 417 F.3d 971, 975 (8th Cir. 2005) (internal quotation marks omitted).

"During a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation. A reasonable investigation includes asking for the driver's license, the vehicle's registration, as well as inquiring about the occupants' destination, route, and purpose." *United States v. Suitt*, 569 F.3d 867, 870-71 (8th Cir. 2009) (internal quotation marks and citation omitted). Here, Trooper Engum initiated the traffic stop because the vehicle did not have a front license plate. In his initial contact with the vehicle, he investigated that traffic violation and conducted a reasonable investigation relating to that traffic violation. During the course of that investigation, he discovered that Dolson had children in the vehicle who were not properly restrained and that Dolson did not have proof of insurance. Therefore, he was authorized to ticket Dolson for those additional traffic violations. When, during the initial contact, Trooper Engum discovered that the driver of the vehicle was not the owner associated with the license plate number on the vehicle, Trooper Engum properly proceeded to inspect the vehicle's VIN plate to determine whether it matched the VIN associated with the rear license plate. Trooper Engum's actions during his first contact with the vehicle therefore were part of a reasonable investigation conducted pursuant to the traffic stop.

"To establish an unreasonably prolonged detention, the defendant must show that the officer detained him beyond the amount of time otherwise justified by the purpose of the stop and did so without reasonable suspicion." *Donnelly*, 475 F.3d at 951-52.

Therefore, the Court first considers whether the length of detention was justified by the purpose of the stop, and then considers whether there was reasonable suspicion to prolong the detention.

First, the Court finds that Trooper Engum detained Dolson beyond the amount of time justified by the purpose of the stop and the related traffic violations. *See Suitt*, 569 F.3d at 870. "Whether a particular detention is reasonable in length is a fact-intensive question, and there is no *per se* time limit on all traffic stops." *Id.* at 871 (internal quotation marks omitted). "Time is an important factor in distinguishing between an investigative stop and a *de facto* arrest . . . [and] a stop may be too long if it involves **delay unnecessary** to the legitimate investigation of the law enforcement officers." *Bloomfield*, 40 F.3d at 917 (emphasis added; internal quotation marks omitted). If an officer does not act diligently in attempting to verify his suspicions as quickly as possible, the detention may be unreasonable. *Id.* at 917. More important than the duration of the delay is "the **unnecessary** nature of the delay." *Donnelly*, 475 F.3d at 953 (emphasis added). Here, Trooper Engum prolonged the detention in several ways: he contacted the Task Force, he returned to the vehicle a second time to ask additional questions, and he radioed for a canine unit.

The Court concludes that, with one possible minor exception, Trooper Engum detained Dolson beyond the amount of time justified by the purpose of the stop and the additional traffic infractions, and that such delay was unnecessary. *See id.* at 951-52. Trooper Engum testified that he returned to the vehicle "to inquire about the ownership and check the VIN number." (*Id.* at 47.) As noted above, Trooper Engum checked the

VIN plate during his first contact with the vehicle, and the Court has concluded that Trooper Engum was aware of the ownership issue at the time of the first contact. Nonetheless, it is plausible that he returned to the vehicle to inquire further about ownership. Such an inquiry would be permissible. *See Suitt*, 569 F.3d at 871 ("When there are complications in carrying out the traffic-related purposes of the stop, . . . police may reasonably detain a driver for a longer duration than when a stop is strictly routine. Reasonableness . . . is measured in objective terms by examining the totality of the circumstances." (internal quotation marks and citation omitted; alteration in original)).

Trooper Engum's other actions, however, were not justified by the purpose of the stop and therefore unnecessarily prolonged the stop. The only infractions at issue involved a missing license plate, failure to provide proof of insurance, and failure to use proper child restraints. When Trooper Engum returned to his squad car after observing these infractions, he spoke with the Task Force for one minute and twenty-four seconds. He testified that he contacted the Task Force so that its investigators would "plainly be aware that [he] was out with Jeff Dolson because it could pertain to another ongoing investigation that was being conducted at that time." (*Id.* at 46.) Yet it is implausible that such minor traffic offenses would be relevant to an ongoing investigation by a Task Force enforcing drug trafficking and violent crime laws. Similarly, radioing for a canine unit and the resultant wait for the canine unit to arrive unreasonably prolonged the stop. Asking Dolson to step out of the Suburban, after Trooper Engum had already had two uneventful encounters with Dolson and had already written out the citations, further demonstrates that Trooper Engum's conduct unreasonably prolonged the stop. *Compare*

*Pennsylvania v. Mimms*, 434 U.S. 106, 107-11 (1977) (per curiam) (holding that officer safety concerns justified the officer's decision to order the driver to get out of the car even without any reasonable suspicion of foul play at the time, where the officer asked the driver "to step out of the car and produce his owner's card and operator's license" at the beginning of the stop); *United States v. Roggeman*, 279 F.3d 573, 575, 580 (8th Cir. 2002) (concluding that there was no Fourth Amendment violation when the officer asked the driver to step out of the vehicle and sit in the squad car while the officer issued the traffic citation) *with United States v. Oliver*, 550 F.3d 734, 737-38 (8th Cir. 2008) (noting that even though an officer may direct the driver to step out of the vehicle to perform a pat-down upon reasonable suspicion that the driver may be armed and dangerous, once the officer has decided "to let the offending driver depart with a ticket, a warning, or an all clear, then the Fourth Amendment applies to limit any subsequent detention or search" (internal quotation marks omitted)); *United States v. Spotts*, 275 F.3d 714, 719 n.2 (8th Cir. 2002) ("Officers who have conducted a lawful *Terry* stop of a vehicle may order the driver to exit the vehicle **pending completion of the stop**." (emphasis added)).

Second, the Court finds that Trooper Engum did not have a reasonable suspicion of criminal activity sufficient to expand the scope of his investigation to include the potential presence of contraband. *See Donnelly*, 475 F.3d at 952.

Trooper Engum provided two reasons for prolonging the detention: Dolson's nervousness and the strong odor of burnt marijuana coming from the vehicle during Trooper Engum's initial contact. The Court has concluded, however, that Trooper Engum's testimony that he detected a strong odor of marijuana during this initial

investigation was not credible.[6]  Therefore, the Court finds that the only credible basis he had for broadening his inquiry and prolonging the detention was Dolson's nervousness.

Nervousness, without more, cannot "give rise to reasonable suspicion" because "it cannot be deemed unusual for a person to exhibit signs of nervousness when confronted by an officer."  *United States v. Guerrero*, 374 F.3d 584, 590 (8th Cir. 2004); *see also Jones*, 269 F.3d at 928-29 ("[E]xtreme and unusually nervous behavior observed in conjunction with only one or two other facts can generate reasonable suspicion that criminal activity is afoot.  Generally, however, nervousness is of limited significance in determining reasonable suspicion. . . .  Because the government repeatedly relies on

---

[6] The Eighth Circuit has recognized that the smell of burnt marijuana provides probable cause to search a vehicle for drugs.  *See, e.g.*, *United States v. Peltier*, 217 F.3d 608, 609-10 (8th Cir. 2000); *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam); *United States v. Neumann*, 183 F.3d 753, 755-56 (8th Cir. 1999); *United States v. Caves*, 890 F.2d 87, 90-91 (8th Cir. 1989); *cf. United States v. Davis*, 569 F.3d 813, 817-18 (8th Cir. 2009) ("If there had been any doubt about whether the smell of smoldering cannabis constituted probable cause to search the vehicle, such doubt was obviated by the discovery of a bag of marijuana in Davis' pocket.  Consequently, Officer Howard was permitted to search Davis' vehicle without a warrant under the automobile exception.").

If the Court were to credit Trooper Engum's testimony as true, it would need to address whether the seizure was unreasonably prolonged in two ways.  First, Trooper Engum delayed in making the call for a canine unit.  Second, Trooper Engum delayed in conducting the search of the vehicle when he already had probable cause to conduct the search, waiting thirty-five minutes between the time he allegedly detected the strong odor of burnt marijuana and the time an officer entered the vehicle to conduct the search.  *Cf. Donnelly*, 475 F.3d at 954 (noting that the officer "called in his request for a drug-dog within twelve minutes of his arrival and **immediately after he developed a reasonable suspicion** of narcotics possession and was denied access to" the vehicle, and contrasting those facts with a case in which the officers "knew well in advance that they would need a drug-sniffing dog yet did nothing to ensure one's presence" (emphasis added)).

Because the Court concludes that Trooper Engum's testimony that he detected a strong odor of marijuana is not credible, the Court does not reach this issue.  The Court notes, however, that in cases in which the odor of drugs provides the **only** evidence giving rise to probable cause, *see, e.g.*, *Caves*, 890 F.2d at 90-91, the evanescent nature of such evidence warrants particular scrutiny of the credibility of the officer who alleges that the odor existed.

nervousness as a basis for reasonable suspicion, it must be treated with caution." (internal quotation marks and citations omitted)).  Here, in particular, Dolson's behavior in "doing a 180 in the driver's seat to face back towards the kids" may be easily explained by the fact that Dolson had two young children "playing" in the back seat area and Trooper Engum was questioning Dolson about "the child restraint issues."

Because Trooper Engum unnecessarily prolonged the detention without reasonable suspicion, the otherwise lawful traffic stop became an unreasonable seizure in violation of the Fourth Amendment.[7]

**B.    The Unlawful Detention Was a But-For Cause of Dolson's Statements, the Physical Evidence Produced in the Squad Car, and the Physical Evidence Obtained During the Search of the Vehicle Interior, and That Evidence Must Be Suppressed as Fruit of the Poisonous Tree.**

Trooper Engum did not have reasonable suspicion to prolong the detention after he wrote out the citation and warning and returned to the Suburban for the third time.  At that point, other than giving the citation and warning to Dolson, "the legitimate purposes for the stop had . . . ceased."  *Cf. United States v. Long*, 532 F.3d 791, 796 (8th Cir.

---

[7] Another means of determining whether a traffic stop is unreasonably prolonged focuses on the point at which the officer decides to release the driver with a citation.  "Once an officer has decided to permit a routine traffic offender to depart with a ticket, a warning, or an all clear, the Fourth Amendment applies to limit any subsequent detention or search."  *Suitt*, 569 F.3d at 871 (internal quotation marks omitted; alteration removed).  There must be some "objective indicia of the officer's intent" to let the offender depart at a particular point in time.  *Fuse*, 391 F.3d at 927.  In some cases, a court may deduce intent from the officer's statements to the suspect.  *See Suitt*, 569 F.3d at 871.  Here, the "objective indicia" of Trooper Engum's intent to let Dolson depart appear during his telephone conversation with the Task Force, when he stated, "Other than nervousness, not right now.  Got two kids in the car and got uh, his uh, wife or girlfriend.  I'm gonna pinch him for no child seat."  After Trooper Engum wrote the citations and returned to the vehicle for the third time, the subsequent seizure was not consensual and was not supported by reasonable suspicion.

2008).  Trooper Engum unreasonably prolonged the detention by asking Dolson to step out of the vehicle, by conducting a pat-down search, by directing Dolson to "cooperate" by sitting in the back of the squad car, and by questioning Dolson in the back of the squad car as they awaited the canine unit.  All of the evidence resulting from this unreasonable seizure is therefore properly suppressed, including Dolson's statements to Trooper Engum after Dolson exited the Suburban, the metal cylinder and rolling papers, the six grams of marijuana, and the firearm.

The canine sniff was the product of an unconstitutionally prolonged traffic stop.  "A dog sniff of the exterior of a vehicle does not constitute a search." *Olivera-Mendez*, 484 F.3d at 511.  Conducting a dog sniff does "not change the character of a traffic stop that is lawful at its inception and otherwise executed in a reasonable manner[.]" *Caballes*, 543 U.S. at 408.  Yet a "dog sniff [is] . . . impermissible if it [is] the result of an unconstitutionally prolonged traffic stop." *Suitt*, 569 F.3d at 870.  For example, "an officer [might] unreasonably lengthen[] a roadside detention until another officer can bring a drug dog to the scene." *Id.*; *see also Caballes*, 543 U.S. at 407-08 (assuming that the fruits of a dog sniff would be suppressed "if the dog sniff had been conducted while [the defendant] was being unlawfully detained").  Here, Trooper Engum unreasonably prolonged the traffic stop, for the reasons discussed above.  Hence, the dog sniff was impermissible.

The search of the vehicle interior did not fall within the automobile exception.  "Under the automobile exception, officers may search a vehicle without a warrant if they have probable cause to believe the vehicle contains evidence of criminal activity." *Davis*,

569 F.3d at 817 (internal quotation marks omitted).  "Probable cause exists where there is a fair probability that contraband or evidence of a crime will be found in" the vehicle. *Donnelly*, 475 F.3d at 954.

Trooper Engum had decided to conduct a "full search" of the vehicle, regardless of the result of the dog sniff.  Setting aside Trooper Engum's testimony that he smelled a strong odor of burnt marijuana, the evidence in support of the search at the time of the search included: (1) Dolson's statement that his "home boys probably" smoked marijuana in the car "the other night"; (2) a marijuana "grinder" and rolling papers Dolson produced to Trooper Engum when Dolson was seated in the back seat of the squad car; and (3) six grams of marijuana Dolson produced to Trooper Engum when Dolson was seated in the back seat of the squad car.

"Only if the constitutional violation was at least a but-for cause of obtaining the evidence is suppression of evidence the appropriate remedy."  *United States v. Peralez*, 526 F.3d 1115, 1121 (8th Cir. 2008) (internal quotation marks omitted).  If an officer does not intend to search a vehicle and then prolongs the stop beyond the time reasonably required to complete its purpose by asking non-routine questions, and then the responses to those non-routine questions give rise to probable cause to conduct a search, then the unconstitutionally prolonged detention is a but-for cause of obtaining the evidence. *See Suitt*, 569 F.3d at 871; *cf. Peralez*, 526 F.3d at 1121.  Here, Trooper Engum did not have reasonable suspicion to prolong the stop, and did not have probable cause to search the vehicle until after he placed Dolson in the back seat of the squad car.  Trooper Engum prolonged the stop beyond the time reasonably required to complete its purpose, in part

by asking Dolson to step out of the vehicle, and in part by asking non-routine questions about marijuana use and about an object in Dolson's pocket that Trooper Engum did not suspect to be a weapon, drugs, or drug paraphernalia. Probable cause was established only during the unconstitutionally prolonged detention, and only as a result of Trooper Engum's non-routine questions that further prolonged the detention. Therefore, the unlawfully prolonged seizure was a but-for cause of obtaining the evidence found in the vehicle. *See United States v. Alvarez-Manzo*, 570 F.3d 1070, 1077 (8th Cir. 2009).

"[B]ut-for causality is only a necessary, not a sufficient, condition for suppression." *Hudson v. Michigan*, 547 U.S. 586, 592 (2006). But-for causation may be too attenuated to justify exclusion. The Court next considers whether the evidence must be excluded under the fruit-of-the-poisonous-tree doctrine. Evidence is excluded as the fruit of the poisonous tree where, "granting establishment of the primarily illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963) (internal quotation marks omitted); *see also Martinez*, 462 F.3d at 910; *United States v. Wipf*, 397 F.3d 677, 683 (8th Cir. 2005) ("Under the 'fruit of the poisonous tree' doctrine, the exclusionary rule bars the admission of physical evidence and live witness testimony obtained directly or indirectly through the exploitation of police illegality."). But if the fruits of the subsequent investigation were obtained by means sufficiently distinguishable from or independent of the unlawfully obtained statements or evidence at issue, then those fruits are admissible. *See Wipf*, 397 F.3d at 683.

The government has not argued that the evidence at issue was obtained by means "sufficiently distinguishable [from the primary illegality] to be purged of the primary taint," that "the causal connection between the constitutional violation and the discovery of the evidence has become so attenuated as to dissipate the taint," or that the evidence "inevitably would have been discovered by lawful means without reference to the police misconduct." *See Hamilton v. Nix*, 809 F.2d 463, 465-66 (8th Cir. 1987) (en banc) (describing the "three analytically distinct exceptions to" the fruit of the poisonous tree doctrine). (*See* Docket Nos. 35, 42.) Therefore, the Court concludes that Dolson's statements to Trooper Engum after Dolson exited the Suburban, the physical evidence produced by Dolson when he was seated in the squad car, and the physical evidence discovered during the search of the Suburban are all properly suppressed as fruit of the poisonous tree.

### C. Trooper Engum Failed to Mirandize Dolson After the Pat-Down Search, and Therefore Suppression of Dolson's Responses to Trooper Engum's Questions Is Warranted.

Even if the Court were to conclude that the traffic stop had not been unconstitutionally prolonged, it would still suppress certain statements because Dolson made them during a custodial interrogation in which he had not been Mirandized.

After the pat-down search, Trooper Engum proceeded to interrogate Dolson. At issue is whether Dolson was ever "in custody" for *Miranda* purposes. A *Terry* stop, including a roadside traffic stop, is non-consensual, and "[o]ne is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning." *United States v. Pelayo-Ruelas*, 345 F.3d 589, 592 (8th Cir. 2003). As

noted above, "[a]fter making an otherwise lawful *Terry* stop, an officer may conduct an investigation reasonably related in scope to the circumstances which justified the [stop] in the first place." *United States v. Banks*, 553 F.3d 1101, 1105 (8th Cir. 2009) (internal quotation marks omitted). The officer may also "engage in brief questioning on matters even unrelated to the original offense if the initial detention is not prolonged by the questions." *Id.* Despite this opportunity for questioning, "most *Terry* stops do not trigger the detainee's *Miranda* rights." *Pelayo-Ruelas*, 345 F.3d at 592; *see also United States v. Johnson*, 64 F.3d 1120, 1126 (8th Cir. 1995). Some *Terry* stops, however, "might involve . . . restraint [comparable to that associated with a formal arrest], necessitating *Miranda* warnings." *United States v. Martinez*, 462 F.3d 903, 909 (8th Cir. 2006).

The test in determining whether a roadside traffic stop amounts to a custodial interrogation subject to *Miranda* is whether the "traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer v. McCarty*, 468 U.S. 420, 437 (1984). "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda*." *Id.* at 440. "[T]he only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442.

The question is whether Dolson's freedom of movement was ever restrained during the interrogation to a degree associated with formal arrest. "*Miranda* warnings are required only where a person's freedom has been so restricted as to render him 'in

custody.' The ultimate inquiry is whether (1) the person has been formally arrested, or (2) the person's freedom of movement has been restrained to a degree associated with formal arrest." *Martinez*, 462 F.3d at 908-09 (citations and some internal quotation marks omitted). Because Dolson was not formally arrested until the end of the stop, the Court's analysis properly focuses on the second inquiry.

"Two discrete inquiries are essential to the determination: first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." *Id.* at 908-09 (citations and some internal quotation marks omitted). "A de facto arrest occurs when the officers' conduct is more intrusive than necessary for an investigative stop. We must consider such factors as the duration of a stop, whether the suspect was handcuffed or confined in a police car, whether the suspect was transported or isolated, and the degree of fear and humiliation that the police conduct engenders." *United States v. Hill*, 91 F.3d 1064, 1070 (8th Cir. 1996) (internal quotation marks and citation omitted). Other factors include "whether the suspect was advised that he was free to go, whether he was restrained, whether he initiated contact with the authorities, whether strong arm tactics or deceptive stratagems were used, whether the atmosphere was police dominated, and whether the suspect was placed under arrest at the termination of questioning." *Johnson*, 64 F.3d at 1126 (citations and internal quotation marks omitted); *see also United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990) (reciting a non-exhaustive list of six indicia of custody, including "whether the suspect was informed at the time of questioning that the questioning was voluntary, that the

suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest," and "whether the suspect possessed unrestrained freedom of movement during questioning"). If there is a de facto arrest, *Miranda* rights attach. *See Hill*, 91 F.3d at 1069-70.

In considering the aforementioned factors, the Court concludes that Dolson's freedom of movement had been restrained to a degree associated with formal arrest by the time Trooper Engum asked Dolson, "When's the last time someone smoked marijuana in your car?" Dolson did not initiate contact with Trooper Engum, and at the time Trooper Engum asked this question, the stop had already lasted more than sixteen minutes. Trooper Engum was in the process of confining Dolson in the back of a squad car after Dolson had requested permission to leave. Dolson was isolated from his family, and the questioning took place on an isolated rural highway on a bitterly cold night. Trooper Engum's conduct prior to and during the pat-down search involved the use of strong-arm tactics and engendered a significant degree of fear. Trooper Engum had never explained to Dolson why he had asked him to step out of the vehicle or what was going to happen next. After Dolson asked why he needed to place his hands on the hood of the squad car, Trooper Engum began to withdraw his sidearm from its holster and used a harsh tone of voice in directing Dolson to comply with the pat-down. *Cf. United States v. Drayton*, 536 U.S. 194, 204 (2002) (concluding that individuals were not seized, in part because the officer "did not brandish a weapon or make any intimidating movements"); *id.* at 205 ("The presence of a **holstered** firearm . . . is unlikely to contribute to the coerciveness of the encounter **absent active brandishing** of the weapon." (emphases

added)).  Dolson was sufficiently fearful by the end of the pat-down search that Trooper

Engum then twice directed him to "relax" while grabbing Dolson's arm.  Trooper Engum

expressly informed Dolson that he was **not** free to go, but did not explain why.  Trooper

Engum used at least two deceptive stratagems.  First, he informed Dolson after the pat-

down that he had smelled an odor of burnt marijuana when he stepped up to the vehicle.

That statement prompted a response of indignation and likely exacerbated Dolson's fear.

It also increased the likelihood that Dolson would attempt to find some plausible

explanation for what Trooper Engum allegedly smelled when Trooper Engum ultimately

posed the question.  Second, when Dolson asked whether he could call an attorney,

Trooper Engum did not provide an oral response but shook his head to indicate "no."[8]

This deceptive response would cause a reasonable person in Dolson's position to be even

more fearful.  The Court also finds that the atmosphere was police-dominated because

Trooper Engum was directing Dolson's movements, using a dominating tone of voice,

and controlling Dolson through the threat of deadly force as well as through physical

---

[8] The Court does not reach the question of whether Dolson successfully invoked his right
to counsel.  "[Q]uestioning may proceed unless a suspect clearly and unambiguously makes
known his desire to have counsel present."  *Dormire v. Wilkinson*, 249 F.3d 801, 805 (8th Cir.
2001).  In *Dormire*, the court concluded that under the circumstances it was "not clear that [the
defendant] was actually requesting the presence of an attorney when he asked, 'could I call my
lawyer?'"  *Id.*  At the time of that statement, the defendant had just asked whether he could
contact his girlfriend, and he had been informed that he could not.  The officer "could have
reasonably believed in these circumstances that [the defendant] was merely inquiring whether he
had the right to call a lawyer, rather than believing that [the defendant] was actually requesting
counsel."  *Id.*  Dolson's request is far less ambiguous.  Here, Dolson first stated, "No, you're not
searching the car, you're not fucking around no more.  Let me go, please."  When Trooper
Engum responded, "No," Dolson replied, "Can I call an attorney?"  Nonetheless, Dolson's
decision to continue talking after Trooper Engum shook his head "no" raises the question of
whether a possibly clear and unambiguous request for counsel was rendered ambiguous by
Dolson's subsequent conduct.

contact. Dolson was not informed that the questioning was voluntary, and he was only informed that he was not under arrest at the end of the questioning.

The Court finds that under the totality of the circumstances, a reasonable person in Dolson's position would not have felt free to decline Trooper Engum's "request" to proceed to the back of the squad car. "Once [an officer] ma[kes] [a] traffic stop, he ha[s] the authority to check [the driver's] license and the [vehicle's] registration, ask [the driver] about his destination and purpose, and **request** that [the driver] sit inside the patrol car." *United States v. Coney*, 456 F.3d 850, 857 (8th Cir. 2006) (emphasis added); *see also id.* at 858 (emphasizing that the encounter was consensual, in part because "[i]t was a cold day and [the officer] wanted to talk to [the driver and the passenger] while sitting inside the patrol car, which could only be accomplished by asking someone to sit in the back seat," and that the officer "did not order [the driver] to sit in the back seat, but asked him if he would mind sitting in the back seat"). Here, Trooper Engum's statement that "I'm gonna ask you to take a seat in the back seat of my squad car" was more than a simple request. After Dolson resisted, Trooper Engum asked, "Are you gonna cooperate?" Dolson responded in the negative and then said, "Let me go, please." Trooper Engum responded, "No," and then repeated his request that Dolson cooperate. Dolson relented and proceeded to the back of the squad car.

Because Dolson was effectively in custody and had not been Mirandized, his statements in response to Trooper Engum's interrogation are not admissible. *See Binion*, 570 F.3d at 1040 ("[S]tatements made by a custodial suspect in response to interrogation are inadmissible unless the suspect has voluntarily, knowingly, and intelligently waived

his right against self incrimination."); *id.* at 1041 ("Interrogation includes both express questioning and words or actions that officers should know are reasonably likely to elicit an incriminating response." (internal quotation marks omitted)).  Therefore, his statements in response to the questions: "When's the last time someone smoked marijuana in your car?" and "What is the hard object in your pocket?" are not admissible.[9]  Under the facts of this case, *Miranda* warrants suppression of the statements: "I don't know.  My home boys probably did the other night," and, in reference to the cylinder, "One of those rollers.  It's, it's paraphernalia.  I'm sorry."[10]

---

[9] Nonetheless, the *Miranda* violation does not warrant suppression of the cylinder and papers.  *See United States v. Morse*, 569 F.3d 882, 884 (8th Cir. 2009) ("[A] violation of the *Miranda* rule does not justify the suppression of non-testimonial physical evidence that is the fruit of custodial interrogation conducted without *Miranda* warnings.").  Similarly, even if Trooper Engum's statements amounted to an interrogation that prompted Dolson to offer up the marijuana on his person, that marijuana would not be suppressed on this basis.  *Id.*  As discussed in greater detail in Part II.B above and in the following footnote, however, the physical evidence is properly suppressed on Fourth Amendment grounds.

[10] The Court notes in passing that even if the traffic stop had not already been unconstitutionally prolonged at the time Dolson sat down in the squad car, Trooper Engum's questions would constitute a Fourth Amendment violation.  Trooper Engum had no reasonable suspicion to warrant broadening the scope of his inquiry for the investigative stop or prolonging the detention.  *Cf. United States v. Olivera-Mendez*, 484 F.3d 505, 507 (8th Cir. 2007) (noting that the officer instructed the driver "to sit in the patrol car **while** [the officer] **issued him a warning ticket**" because "it was an extremely cold day").  Trooper Engum's only purpose in directing Dolson to sit in the back of the squad car was to continue questioning him.

Trooper Engum's off-topic questions created considerable inconvenience and significantly prolonged the detention.  An officer's off-topic questions "do not turn reasonable detention into unreasonable detention, even if they extend the length of the detention slightly," so long as they "create little or no inconvenience."  *Id.* at 510-11 (internal quotation marks omitted).  Here, however, Trooper Engum's off-topic questions about marijuana use arose in the context of Trooper Engum directing Dolson to "cooperate" by sitting in the back seat of the squad car.  Dolson expressed his desire to leave and Trooper Engum denied that request.  Dolson expressed his desire to call an attorney and Trooper Engum shook his head "no."  The off-topic questioning in the squad car created significant inconvenience to Dolson, who had expressed his desire to

(Footnote continued on next page.)

# ORDER

Based on the foregoing, and all the files, records, and proceedings herein, the Court **SUSTAINS** defendant's objections [Docket No. 40] and **REJECTS** the Report and Recommendation of the Magistrate Judge [Docket No. 39], Accordingly, **IT IS HEREBY ORDERED** that:

1.    Defendant's Motion to Suppress Evidence Obtained as a Result of Search and Seizure [Docket No. 21] is **GRANTED**.

2.    Defendant's Motion to Suppress Statements, Admissions, and Answers [Docket No. 22] is **GRANTED**.

3.    The jury trial in this case is now set for Monday, December 14, 2009 at 9:00 a.m.   Trial will be held at the United States Courthouse in Fergus Falls.

_____
(Footnote continued.)

leave or, at the very least, contact an attorney.  The off-topic questions also appreciably extended the length of the detention.

Trooper Engum also had no reasonable suspicion to justify questioning Dolson about the cylinder.  If Trooper Engum had suspected that the cylinder was drug paraphernalia, he could have removed it during the pat-down search, but he testified only that he believed the cylinder may have been some type of weapon.  As discussed above, the Court concludes that Trooper Engum's testimony on that point is not credible, because Trooper Engum allowed Dolson to sit in the back of the squad car while still possessing what Trooper Engum purported could have been a weapon.  Therefore, Trooper Engum's questions about the cylinder unnecessarily prolonged the traffic stop.

It would be disingenuous to argue that Trooper Engum simply placed Dolson in the squad car so that he could explain the citations.  Trooper Engum testified that he separated Dolson from the Suburban because of the alleged "controlled substance in the vehicle."  He did not testify that he feared Dolson was armed or that he wanted to separate Dolson from the vehicle in order to explain the citations.  Moreover, Trooper Engum never made **any** effort to explain the citations after directing Dolson to sit in the squad car.  Instead, he proceeded directly to questioning Dolson about marijuana.

DATED: November 25, 2009                    s/ John R. Tunheim
at Minneapolis, Minnesota.              JOHN R. TUNHEIM
                                   United States District Judge